THE STATE v. MARCKS, *Appellant.*

In Banc, July 6, 1897.

1. **Rape:** DELAY IN MAKING KNOWN THE OUTRAGE. The absence of an immediate complaint and of an outcry by the female who claims to have been outraged is a strong reason why the jury should infer that the charge of rape is feigned and false; but when there is evidence of positive force on the one side, and of resistance to the full extent of the ability of the female on the other, the effect of the delay upon her credibility and the want of an outcry by her and the threats used all become *questions of fact* for the consideration of the jury, and where the verdict has met with the approval of the trial court the appellate court should not assume to pass upon the credibility of the prosecutrix, but leave that question to the jury and trial court who heard and saw the witnesses.

2. ———: SUFFICIENCY OF EVIDENCE: CORROBORATION OF A LOATHSOME DISEASE. Where the evidence showed that the prosecutrix was sixteen years old, was under-sized, was still wearing short dresses, worked for defendant in his shop and frequently visited at his house; was a sister of his wife, to whom he had been married only five weeks; that often in her presence she and defendant playfully wrestled with each other, which familiarities were permitted on account of the relationship; that early one morning while the wife was at work across the hall where she had been sent by defendant, she was suddenly seized by him, thrown on the bed and otherwise forcibly outraged; that she testified that she resisted his assault to her full ability, and did not consent to the intercourse, and made an outcry as long as she could; that she did not tell her sister of the occurrence when she returned to the room because she had been married only a few weeks, and did not tell her mother for a week afterward, it is *held* that there was sufficient direct and positive evidence to justify a conviction of rape, *and* that the silence of the female under the circumstances thus explained was a question of fact for the jury. *Held*, also, that as her testimony as to the time when and the place where the outrage was committed, and in the naming of the defendant as her despoiler, was corroborated by him in every essential particular, she was also corroborated by the loathsome disease he imparted to her at that time.

3. ———: UNCORROBORATED EVIDENCE. The exercise of discretion by the jury in convicting defendant of rape upon the uncorroborated testimony of the prosecutrix, is proper, even though her conduct as to silence may not in all things conform to the ordinary experience of mankind.

4. ————: ————: EQUIPOISE OF EVIDENCE. In a rape case, if the
defendant testifies and denies the rape, and the prosecutrix stands
alone unsupported and uncorroborated, there is no such *equipoise* of
oath against oath as will overthrow a conviction, and the prosecution
will not on that account fail for want of sufficient evidence. (Over-
ruling in part paragraph 5 of *State v. Patrick*, 107 Mo. 147.

5. ————: EVIDENCE: CONCURRENT VENEREAL DISEASE. Evidence that
five weeks after the alleged rape defendant had the same specific
gonorrheal disease with which the prosecutrix was shown to have
been afflicted within a week or so thereafter, in connection with
the confession of the defendant that he had sexual intercourse with
the girl at that time, is *held* to be competent under the other circum-
stances of this case, which show that no exception was saved to the
evidence at the time of its offer, and the defendant not having
moved the court to withdraw it from the jury by appropriate instruc-
tions until the close of the evidence, the motion was properly denied.

*Appeal from St. Louis Criminal Court.*

AFFIRMED.

*Martin & Bass* for appellant.

(1) The proper course to pursue is not to admit
evidence, the competency and relevancy of which is not
apparent until the competency or relevancy is disclosed
by the subsequent evidence. *State v. Thomas*, 99 Mo.
235. (2) That on the eighth day of May, five weeks
after the alleged assault, the defendant was suffering
from gonorrhea, was not such a fact, either by itself or
in connection with the fact that the prosecuting wit-
ness was then also suffering from the same disorder,
as proved or rendered probable the existence or non-
existence of the fact that defendant had raped or had
sexual intercourse with her. It was a circumstance
too remote; not part of the *res gestae;* it was a collat-
eral fact which afforded no reasonable presumption or
inference as to the principal fact in dispute. Nor was
this testimony admissible upon the theory that it cor-
roborated the prosecuting witness in her statement

"that the defendant had had sexual intercouse with her." *State v. Houx*, 109 Mo. 654; *State v. Thomas*, 78 Mo. 327; *State v. Grant*, 79 Mo. 113; *State v. Cooper*, 71 Mo. 436; *State v. Scholl*, 130 Mo. 396; *State v. Young*, 119 Mo. 495; *State v. Primm*, 98 Mo. 368; *State v. Jaeger*, 66 Mo. 173; *State v. Burgdorf*, 53 Mo. 65. (3) The prosecutrix, in a trial for rape, must be corroborated, and where her testimony as to the perpetration of the alleged offense is explicitly contradicted by the defendant, the evidence will be insufficient to support a conviction. *State v. Patrick*, 107 Mo. 147; *State v. Mathews*, 19 Neb. 330; *State v. Primm*, 98 Mo. 368; 2 Bish. New Crim. Proc., sec. 969, and cases cited; *State v. Witten*, 100 Mo. 525; *State v. Cunningham*, 100 Mo. 382; *State v. Wilson*, 91 Mo. 410; *Barney v. The People*, 22 Ill. 160. (4) To establish the crime of rape it must be proved beyond a reasonable doubt that there was actual resistance. A passive policy will not do. *State v. Burgdorf*, 53 Mo. 65; *State v. Patrick*, 107 Mo. 147. (5) The degree of credibility in a rape case to be attached to testimony of the prosecuting witness, and as to whether there are contradictions therein, are to be determined by the jury under appropriate instructions. *State v. Jones*, 61 Mo. 232; *State v. Witten*, 100 Mo. 525; *Reynolds v. State*, 27 Neb. 90; *Conners v. State*, 47 Wis. 523.

*R. F. Walker*, Attorney-General, and *C. O. Bishop* for the State.

(1) It has been settled in this State that a conviction of rape may be had upon the uncorroborated testimony of the prosecutrix. *State v. Dusenberry*, 112 Mo. 292. (2) There was no exception saved to the action of the court in admitting the evidence as to the

appellant's venereal disorder, and appellant will not be heard to complain here. *State v. McCollum*, 119 Mo. 469, overruling *State v. O'Connor*, 65 Mo. 374. (3) The testimony of the superintendent of the city hospital that he had made a physical examination of the prosecutrix a week or ten days after the alleged assault and found her suffering from a virulent form of venereal disease, was admissible in corroboration of the testimony of the prosecutrix that appellant had carnally known her, in connection with the testimony that he was suffering at the same time with the same disease. *State v. Sanford*, 124 Mo. 484.

GANTT, J.—The defendant was indicted at the May term, 1895, of the St. Louis Criminal Court, for rape alleged to have been committed by him upon one Nellie Berger, a female over the age of fourteen years, in the city of St. Louis on the first day of April, 1895. At the July term, 1895, he was duly arraigned and entered his plea of not guilty, was tried and convicted, and his punishment assessed at five years in the penitentiary. From sentence on said verdict he appeals.

The testimony developed that defendant was a brother-in-law of the prosecutrix, having married her sister on the twenty-sixth of February, 1895. He carried on a business of making "shop coats." The prosecutrix not only worked for him, but often visited his wife, her sister. On the morning of April 1, 1895, she went to his house, and when she arrived defendant and his wife had not yet arisen. Her sister sent her on an errand, and while she was absent defendant and his wife arose, dressed and ate breakfast. There were three rooms in the apartments occupied by defendant —two rooms, a hall, and the kitchen across the hall. When prosecutrix returned that morning, she sat down on the bed in the kitchen with defendant and his wife,

and they chatted and laughed awhile, and then defendant sent his wife into the shop room across the hall to work.   After her departure he began playing with the prosecutrix, wrestling with her in a joking way, as they often did.   While sixteen years old, she was still quite small and wore short dresses.   Her station in life appears to have been very humble.   She seems to have permitted his familiarities as if he were her brother.   She testified that while they were thus playing together on the morning mentioned, he seized her so unexpectedly that before she could realize her position he had her completely in his power, and *by force* had sexual connection with her.   She testified that she resisted his assault to her full ability, with all the strength she had, and never at any time consented to the intercourse.   She testified she holloed.   ''I just screamed at first; then I holloed and I said, 'My God, Charley, you are killing me.'   He told me to shut up, and then I was in so much pain I couldn't hollo.''   She says she did not tell her sister when she came into the room soon after the occurrence; that her sister had only been married to defendant a few weeks, and she hated to tell her.   She told her mother about a week after the occurrence.

I.   The sufficiency of the evidence to sustain a conviction for rape is challenged.   We think there was sufficient direct and positive evidence to justify a conviction of rape in this case.   Taking into account the age of the girl; that she was still wearing short dresses; the relationship of defendant; the familiarities permitted on account of that relation; the sudden attack and advantage taken of the girl; her resistance and cries, and her positive evidence that she never at any time consented to the intercourse, we think the criminal court properly submitted the facts to the jury.

It is urged that she is not corroborated; that her

own evidence destroys the charge of rape. But is she without corroboration? Without knowing what the defendant would testify, she went on the stand and testified (carefully and candidly it seems to us) to the *time when and place where* the outrage was committed, and named the defendant as her despoiler. In all these essential particulars she was fully corroborated by the defendant himself, and contradicted by him only as to the force in accomplishing the penetration. She is also corroborated by the loathsome disease which he imparted to her.

Is he to go acquit because she made no immediate complaint to her sister, or her mother, or because she gives an unsatisfactory reason for her failure to do so? It is true there is no evidence of threats of violence if she told of the outrage, but it is not to be forgotten that she was young and ignorant, and might well have hesitated at charging her sister's husband with such a crime to that sister. But let it be admitted that her delay was unreasonable, measured by ordinary experience, and that it is a circumstance which excites suspicion of her veracity and tends to discredit her, the question arises, does it do more than this? Does it raise such a conclusive presumption against her evidence that *an appellate court* is justified in ignoring the verdict of a jury, and the refusal of the criminal court to set aside that verdict on that ground alone? On this point we think the great weight of authority is to the contrary. In *Higgins v. People*, 58 N. Y. 379, Chief Justice CHURCH, for the court, said: "Any considerable delay on the part of a prosecutrix to make complaint of the outrage constituting the crime of rape, is a circumstance of more or less weight, depending upon the other surrounding circumstances. There may be many reasons why a failure to make immediate or instant outcry should not discredit the witness. A

want of suitable opportunity, or fear may sometimes excuse or justify a delay. *There can be no iron rule on this subject.* The law expects and requires that it should be prompt, but there is and can be no particular time specified. The rule is founded upon the laws of human nature, which induce a female thus outraged to complain at the first opportunity. Such is the natural impulse of an honest female. But if instead of doing this she conceals the injury for any considerable length of time, it naturally excites suspicion of fraud and tends to discredit her."

In *State v. Peter*, 8 Jones' Law (N. C.), 21, Chief Justice PEARSON, for the court, discussing a charge in which the fact that the woman had not made known or complained of the outrage for two weeks was presented to the jury as a circumstance affecting her credibility, said: *"It is not a rule of law that silence, under such circumstances, raises a presumption that the witness has sworn falsely.* The passages in the books to which reference was made on the argument use the word 'presumption,' not as a rule of law, *but an inference of fact,* and treat of *silence* as a circumstance tending strongly to impeach the credibility of the witness, on the ground that a forcible violation of her person so outrages the female instinct that a woman not only will make an outcry for aid at the time, but will instantly and involuntarily, after its perpetration, seek someone to whom she can make known the injury and give vent to her feelings. The want of this demonstration of feeling or 'involuntary outburst' is treated of as a circumstance tending to show consent on her part; *but it is nowhere held that this female instinct is so strong and unerring as to have been made the foundation of a rule of law, as distinguished from a rule in respect to evidence, and the weight to which it is entitled is a matter for the jury."*

In *State v. Knapp*, 45 N. H. 148, the court said: "The grounds upon which is received the proof of complaints by the prosecutrix, made soon after the injury, are that they are corroborative of her testimony on the stand, and tend to repel the presumption that would arise from the absence of such complaints; for it is laid down, very generally, that if such complaints are not made soon, or within a reasonable time after the injury, or without an inconsistent delay, it is a strong though not conclusive presumption against the truth of the charge.

It is equally well settled, also, that the delay to make complaint may be explained by showing that it was caused by threats, or undue influence of the prisoner. *"It is in truth a question purely of fact to be determined by the jury;* and how much the delay in making complaint ought to weigh against the prosecution must depend upon the circumstances of each particular case."

To the same effect substantially, see *State v. Niles*, 47 Vt. 82; *Young v. Johnson*, 25 N. E. Rep. (N. Y.) 363; *People v. O'Sullivan*, 104 N. Y. 481; *Dunn v. State*, 12 N. E. Rep. (Ohio) 826.

Our examination leads us to believe that the absence of an immediate complaint and the want of an outcry are strong and potent reasons why the jury should infer that the charge of rape is feigned and false, yet when there is positive evidence of force on the one side, and of resistance to the full extent of the ability of the female on the other, *the whole question becomes one of fact,* and where the verdict has met the approval of the trial court, this court should not assume to pass upon the credibility of the female but leave it to the jury and the trial court who heard and saw the witnesses.

It seems to us moreover that it is in harmony with

the analogies of the law to leave the credibility of the witness to the jury, although the evidence is weakened by an adverse presumption against its truthfulness. Thus this court in *State v. Harkins*, 100 Mo. 666, approved an instruction for the State which declared that the jury were at liberty to convict the defendant *on the uncorroborated testimony of an accomplice.* This rule has been repeatedly followed by this court since that case. *State v. Jackson*, 106 Mo. 174; *State v. Woolard*, 111 Mo. 248; *State v. Minor*, 117 Mo. 302; 1 Bishop's Crim. Proc., sec. 1169; 8 Crim. Law Mag., sec. 3, p. 6; Roscoe's Crim. Ev. [8 Ed.], p. 201; 1 Greenleaf's Ev., sec. 380; Wharton, Crim. Ev., sec. 441. If it is competent to convict upon the uncorroborated evidence of an accomplice, a confessed criminal, why may not a jury convict upon the evidence of the injured woman even though her conduct may not in all things conform to the ordinary experience of mankind? Why may not the jury exercise the same discretion in the one case as in the other and if convinced beyond a reasonable doubt convict the party charged with rape?

II. A reversal of the judgment is asked upon the proposition that in a rape case if the defendant testifies and denies the rape and the prosecutrix stands alone unsupported and uncorroborated *there is an equipoise of oath against oath and the prosecution must fail for want of sufficient evidence to warrant a conviction*, and *State v. Patrick*, 107 Mo. 147, is cited as committing this court to that statement of the law. The writer concurred in the opinion in *State v. Patrick*, but he did not think then, nor does he now understand, that he necessarily committed himself to this doctrine. In that case our learned brother, in the fifth paragraph of his opinion, considered whether the evidence in that case was sufficient to support the verdict. He had in

the preceding part of his opinion discussed the admissibility of the statements made by Mrs. Patrick as evidence in behalf of the State and cited many authorities. Proceeding to discuss the insufficiency of the evidence, he says: "If the authorities already cited as to the absolute necessity of corroboration of the prosecutrix, where, as here, the defendant occupies the witness stand and explicitly denies the perpetration of the offense charged, *thus creating an equipoise of oath against oath*, [are to control], then the evidence is wholly insufficient, as there is no corroboration whatever in the case. The authorities on this point commend themselves as being in accord with sound reason and universal human experience, and so this case might well be made to rest on the entire absence of any corroborative evidence." But it was not permitted to rest upon that announcement. On the contrary, our learned brother proceeded to demonstrate that upon the whole case there was a complete failure of substantial evidence to justify the conviction. However that may be, we feel now that we can not assent to the proposition, and as the question is one of great importance in the administration of the criminal law, we desire to state our reasons for not concurring.

The rule announced by our learned brother finds ample support in *Mathews v. State*, 19 Neb. 330, and *Topolanck v. State*, 40 Tex. 160. It was laid down in those cases that in the absence of corroboration the testimony of the prosecutrix alone is not sufficient to sustain a conviction. On the other hand it is asserted with equal clearness by the Supreme Court of Alabama, in *State v. Boddie*, 52 Ala. 395, that "there is no rule of law which forbids a jury to convict one charged with this crime on the uncorroborated testimony of the prosecutrix although she be impeached for ill fame in chastity or otherwise, provided the jury are satisfied

beyond a reasonable doubt of the truth of her testimony." This case was again followed in *State v. Burnett*, 83 Ala. 40, and this statement of the rule is approved by 2 Bishop, New Criminal Procedure, sec. 968. Lord HALE stated the rule in this way: "The party ravished may give evidence upon oath, and is in law a competent witness; but the credibility of her testimony, and *how far she is to be believed, must be left to the jury, and is* more or less credible according to the circumstances of fact that concur in that testimony." 1 Hale, P. C. 633. See, also, 1 East, P. C. 448; 2 Roscoe's Crim. Ev. [8 Ed.], mar. page 903.

All the common law writers and nearly all courts have commended Lord Hale's observation that "the charge of rape is an accusation easy to make, and hard to be proved, and harder still to be defended by the party accused, though ever so innocent;" and his summing up of the concurring facts, which naturally gave greater probability to the evidence of the prosecutrix; and on the other hand of the circumstances which would tend strongly to convince a jury that her evidence was false or feigned, is most admirable, but it is now generally conceded that under systems of procedure like ours in which the judge is not permitted to charge a jury orally and instructions are all written, courts must not invade the province of the jury by pointing out what inferences of fact they should draw from the evidence, nor to point out to them that certain testimony is *weak* or *strong*. To weigh the evidence is the prerogative of the jury, not of the court. The practice of the common law courts in this respect is forbidden by our statute. Hence much of Lord Hale's argument, excellent and convincing as it is, would not be tolerated in an instruction now, nor should it control a jury, as he himself recognized when he closed his enumeration of the suspicious circum-

stances by saying "these and like circumstances (among others the failure to make an outcry) carry a strong *but not conclusive presumption* that her testimony is false or feigned."

We take it then at common law there was no absolute rule of law requiring corroboration in prosecutions of rape as in treason, or perjury, or in seduction under our statutes, and this much Chief Justice Maxwell admits in *Mathews v. State*, 19 Neb. 330, but he avoids the conclusion we have reached by invoking the statute of Nebraska which allows a defendant to testify in his own behalf. Compiled Statutes Nebraska, sec. 473, 1887; Consolidated Statutes Nebraska, sec. 6101, 1891.

We have been unable to find anything in the Compiled or Consolidated Statutes of Nebraska which tends to disturb or change the common law rule beyond the fact that the defendant is rendered a competent witness. The statute, in enabling him to testify, does not define what amount of credibility is to be attached to his evidence, and we confess we do not grasp the reasoning by which the conclusion is reached that merely because the defendant is rendered competent to testify, his evidence, denying the crime, is to be construed, as a matter of law, as a perfect stand-off to that of the injured woman. Whatever may be the construction of the Nebraska law on this point we feel quite sure that no such weight is to be accorded to the testimony of a defendant under section 4218, Revised Statutes 1889, which provides that a defendant shall not be incompetent to testify by reason of being the person on trial, but any such fact may be shown and considered for the purpose of affecting his credibility. There is nothing in our statute permitting a defendant to testify which indicates that his testimony is to

be considered as creating an equipoise with that of the prosecutrix.

Each is a competent witness subject to the crucial test of cross-examination and impeachment and the jury's duty and prerogative is to weigh all the evidence and credit that which to them appears most reasonable and creditable, and reject that which to them may seem unreasonable and incredible. We can not concur in the statement that merely because a defendant testifies an equilibrium of evidence is produced. We think it must occur to every lawyer's experience that the simple unvarnished statement of one witness is often so convincing that it outweighs the testimony of many on the adversary side, whose manner, bearing, and reputation are such as to discredit them even without direct impeachment. Indeed it is often hard to conceive of an equipoise of evidence, even as between two men of equal moral standing. So much depends upon the manner and characteristics of the witnesses and their ability to state clearly what they know of a given transaction; of the power to recall vividly the occurrences about which they testify. Nowhere is the maxim "*qualitas non quantitas*" more appropriately invoked than in the weighing of testimony.

III. As to the evidence tending to prove that five weeks after the date of the rape was charged to have been committed defendant had the same specific gonorrheal disease with which the prosecutrix was afflicted, we think in view of the confession of defendant that he had, on April 1, 1895, sexual connection with the girl, and in view of the fact that she was shown to have been afflicted with it a week or so later, that it was competent. At least it does not constitute reversible error. Moreover no exception was saved to its admission and it was not error to refuse to exclude it afterward. A party can not speculate upon the effect of evidence which is

objectionable upon its face when offered, as this clearly was, if ever, and then complain of a refusal to reject it later in the trial. *Maxwell v. Railroad*, 85 Mo. 95; *State v. Hope*, 100 Mo. 347; *People v. Chacon*, 102 N. Y. 669; *Miller v. Montgomery*, 78 N. Y. 282; *Quin v. Lloyd*, 41 N. Y. 349; *Barkley v. Copeland*, 86 Cal. 483; 1 Rice, Ev., secs. 258 and 259; *Hickman v. Green*, 123 Mo. 165.

Accordingly the judgment of the criminal court of St. Louis is affirmed.

BARCLAY, C. J., and MACFARLANE, ROBINSON and BRACE, JJ., concur. BURGESS, J., concurs in paragraph 2 but dissents from the view expressed in the first paragraph, and holds the evidence insufficient to sustain a conviction. SHERWOOD, J., dissents, and expresses his views in a separate opinion.

SHERWOOD, J. (*dissenting*)—The charge in this case is rape, of which defendant was convicted and his sentence fixed at five years in the penitentiary. From the judgment he has appealed. The locality of the crime charged was a small kitchen on the ground floor, in which was a bed on which defendant and his wife slept. There were only three rooms on the ground floor, and these were let to defendant, who in one of the other two rooms carried on with his wife the business of coat making or tailoring. The kitchen, which performed the triple function of kitchen, dormitory, and dining room, was separated from the other room by a little hall, and the upper rooms, leased to defendant's father, were occupied by the latter and his wife, and in one of them was carried on by defendant's father and mother the business of coat making and in the rooms devoted to this purpose, both above and below stairs, several hands were employed almost constantly during the usual working hours on week days.

The date of the crime is fixed by the indictment and the evidence on April 1, 1895, and the venue laid in the bed in the kitchen.

The testimony in brief of the prosecutrix was to the effect that on the fifth of March preceding she was sixteen years old; that on the morning in question she came down from her mother's house to that of defendant's to work at his business of coat making. Defendant, it appears, was her brother-in-law, and had been married to her sister only some five weeks. Arriving at her brother-in-law's at about 7 o'clock in the morning and knocking at the kitchen door where her sister and husband were, her sister told her that they would not have any work, but sent her to the store on some errand. On her return her brother-in-law, who had been out, returned with a coat, which he directed his wife to take to pieces, etc. He then picked her up, threw her on the bed as was his custom to do, and was wrestling with her when her sister went out into the front room to put the two pockets in the coat, leaving them on the bed together. Then the prosecutrix states that defendant suddenly seized her, held her hands across her breast with one of his, prized her legs apart, which were crossed, with his foot, and accomplished his purpose, struggling, as she says, all she could to prevent him. During the perpetration of the act she says she told him: "My God, Charley, you are killing me," when he said, "Oh, shut up," and then uttered some very vulgar expressions. After he had gotten through she says: "My sister was coming from the room, he must have heard her coming, for he let me go, and *I got up and brushed my hair and set back on a chair so she wouldn't know any different.*" Asked what defendant did when her sister was coming in the room, she says: "I don't know what he did; I was so busy thinking that I didn't see what he did."

Asked if she made any complaint right away, she said, "No sir; it was one week exactly, in the evening that I told my mother." Asked why she did not make any complaint at that time, she replied: "Because my sister hadn't been married to him long, and I didn't want to let it be known to make her unhappy," and that it was *on her sister's account* that she said nothing. After the transaction on the bed was over, as previously stated, her sister came-in, and then asking her if she wanted it, gave her some coffee which she drank, but that she didn't tell her sister while she was drinking the coffee, and that she *"didn't intend to tell her."* This was on Monday morning, April 1. After she drank the coffee prosecutrix went home and felt pains that night, etc. On the next Saturday she says her brother-in-law, the defendant, came to her mother's home and told witness they had some work for her to do and told her to come down there on the following Monday. Accordingly, on the next Monday morning, one week from the time of the occurrence in the kitchen, she went down to defendant's house, but when she arrived there she was told there wasn't any work to do for defendant, but it was for the "old man," as defendant's father was called, and that she was angry when she heard that, and said she didn't want to work for the old man, because he scolded so much. She then states that defendant, who was alone in bed in the kitchen, called her, and said: "Come in here, Nell." "He called me five or six times, I guess; I was angry; he called me up to him and put his arms around my waist; he was in bed; he says: 'You wouldn't do anything for anybody but me, would you, Nell?' I says: 'No, I won't do anything for you.' He says: 'Oh, yes you will.' Then he got angry and took hold of me and threw me over on the bed, and I had a hard tussle with him to keep him from as-

saulting me again the same way." That on that night when she went to bed she told her mother what had occurred; that the reason she told her was this: "I kept telling her I didn't want to go down there any more; she wanted me to go for some money he owed me; I says: "I don't want to go down there any more only when they are working;" I says: "I never want to be in their house again." Her mother then asked her why she did not want to go down to defendant's house, and speaking of it she says: *"Because my mother asked me and it made me angry;* she told me it was nonsense, the reason why I didn't want to go down there, and that made me angry to think that she should say it was nonsense when it was so important a case, and I couldn't keep from telling her and I just told her." Shortly after this she went to consult a physician, who gave her some medicine, and after this she was confined to her bed for about a week, being attended by a physician, and then on the first day of May she was sent to the hospital, where she was found to be suffering with a virulent case of specific gonorrhea and peritonitis (arising from such gonorrheal condition) suffering a great deal of pain and high fever, and had a severe discharge. After remaining at the hospital about twelve days, although not cured, she wanted to go home and was accordingly discharged.

Testimony of several witnesses for the defense shows that the incidents which the prosecutrix relates as to her second visit to defendant's rooms, really occurred on the second day of April and not a week after the alleged ravishment. It was in evidence, also, that the prosecutrix was very affectionate in her demeanor toward defendant; would follow him around, sit in his lap and kiss him on repeated occasions, as testified to by girls who worked in the shop with her. There was

also testimony of two witnesses that they, companions of defendant's, had seen him in copulation with prosecutrix on his bed in the kitchen on the morning of March 18 next preceding the Monday of April 1.

Neither on direct nor cross-examination of the prosecutrix did it appear that she was threatened or intimidated or in any manner under the control of defendant and thus prevented from making complaint. Nor does it appear that her opportunities were not the most ample for making complaint; indeed, she states that she reached her mother's house shortly after the alleged occurrence, but did not tell her mother until a week had elapsed, and then only after defendant had made a fresh assault upon her, and then only because she became *angry at her mother* because the latter insisted that the reason she gave for not wishing to go down to defendant's house was "*nonsense.*" Nor does it appear *when* she told her sister of the occurrence, but it would seem that it was not until after her return from the hospital, and as she did not ascertain what ailed her until she reached the hospital, and as she remained there for twelve days, it is not at all probable she conveyed the information to her sister until about the fifteenth of May or thereabouts. Indeed, she intimates as much in her cross-examination, because she says in reference to that, "*When I was horribly diseased, then I couldn't help telling her.*" And thereupon being asked the following questions, she made thereto the following replies:

"*Q.* And that is the reason you told it? *A.* Yes, I told it because I wanted him punished; my sister's feelings was all gone then.

"*Q.* And if Charley hadn't given you the disease you wouldn't have told it, would you? *A.* I don't know for sure, I might have."

Vol. 140 mo—43

It must be quite apparent from what has been already related that there were no elements of corroboration in this case. Now corroboration may occur in various ways: *First*, and chiefly, by the immediate complaint of the outrage as soon as suitable opportunity offers. Such opportunity certainly was afforded immediately upon the sister of the prosecutrix coming into the room, and certainly such opportunity was again afforded when the prosecutrix returned home where her mother was, just after she drank the cup of coffee her sister gave her. But not a word is heard from the lips of the prosecutrix on the subject of the outrage, until a week after its occurrence, until after she had suffered pain, and until after the attempted repetition on the morning of that day. And even then the revelation is not made to the mother as the result of a natural outburst of outraged feeling, but because she *grew angry* at her mother. In a word, her complaint to her mother was not the language of any emotion caused by the supposed occurrence, but simply hearsay, the relation of a past transaction, and therefore possessed of none of the probative force of a complaint, because lacking every dominant characteristic which makes such utterances receivable in evidence.

When such a crime as the one here charged is perpetrated on a woman, it is so natural to tell at once of the foul occurrence that the universal experience of mankind is that when it happens, instinctively and immediately the injured female tells of it upon the first opportunity, in heart-broken and frenzied accents.

Other features of corroboration consist in outcries made while the act is being done; in torn clothing, in disheveled hair, in exhibitions of physical and mental anguish, in the fact that the ravisher fled for it, etc. None of these signs or symptoms appear in this record; on the contrary, so soon as she hears her sister coming,

the prosecutrix got up and brushed her hair, and set back in the chair *"so she wouldn't know any different."*

Defendant admitted the connection, states he had enjoyed similar favors on former occasions, but when testifying explicitly denied the rape, averring that the prosecutrix was entirely willing. In *State v. Patrick,* 107 Mo. 147, we ruled that when the defendant denied the criminal act, and when there were no such circumstances of corroboration as above set forth, there would be an *equipoise* of oath against oath, and that in such case the uncorroborated oath of the prosecutrix alone would be wholly insufficient to warrant a conviction. That case is decisive of this one, and in it the authorities are reviewed at considerable length, many of them fully sustaining the position there taken.

On the eighth of April, one week after the happening of the event charged in the indictment, the prosecutrix was examined by Dr. Marks, who found her laboring under an attack of specific gonorrhea. Over the objection and exception of defendant he was permitted to prove what was the condition of the prosecutrix on the eighth of April, as already stated.

Defendant, however, was not arrested nor taken to the hospital until May 8, five weeks after the date of the offense charged. When defendant reached the hospital he was examined by the attendant physicians and found also to have specific gonorrhea. This testimony was likewise objected to by defendant, but his objection was overruled. At the close of the evidence, defendant renewed his objection to the testimony respecting the prosecutrix having a certain venereal disease and by written motion moved that the jury be instructed to disregard it, because it did not connect defendant with the offense charged. But this motion was denied and defendant excepted. Among the in-

structions given the jury by the court of its own motion, was one in these words:

"The testimony concerning the prosecuting witness and the defendant having a venereal disease, subsequent to the alleged assault, is admitted only for the purpose of corroborating the statement of the prosecuting witness, that the defendant had sexual intercourse with her. Such disease has no bearing upon the question of force or consent."

The *State v. Sanford*, 124 Mo. 484, has been cited as supporting these rulings in regard to the admission and refusal to exclude such evidence, but that is a misapprehension of that case. There the offense was committed on a little girl only eight years of age, and within a week thereafter the accused being examined was found to have the same disease.

The obvious distinction between that case and this is that here the examination of defendant took place five weeks after April 1, and he was found to have the same complaint as that of the prosecutrix. But this period was entirely too remote to afford any corroboration of the prosecutrix's story. Besides, it could afford no corroboration as to the alleged *rape*, and the sexual intercourse this defendant admitted. So that the only effect of the introduction of such irrelevant evidence was to encumber the case with wholly extraneous matter, and tend to the prejudice of defendant with the jury. *Sutton v. Johnson*, 62 Ill. 209.

Error was therefore committed in the admission of such evidence and in denying the motion of defendant to exclude by an instruction to the jury evidence respecting the prosecutrix having a venereal disease.

And where irrelevant evidence is improvidently admitted, it is entirely competent for the court on motion to exclude it at any time before the cause is

finally submitted to the jury. *State v. Cox*, 65 Mo. *loc. cit.* 32; *State v. Owens*, 79 Mo. *loc. cit.* 631; *State v. Robinson*, 117 Mo. *loc. cit.* 664; *State v. Welsor*, 117 Mo. *loc. cit.* 579; *Bank v. Murdock*, 62 Mo. *loc. cit.* 74.

In the three cases first above cited from our own reports, no objection was made to the admission of the obnoxious evidence, but this was not regarded as preventing the success of such motion to exclude. This is the rule also elsewhere. *Selkirk v. Cobb*, 13 Gray, 313; *Ib.*, *loc. cit.* 315, 316, where no objection was made to the objectionable evidence until in the midst of the argument to the jury. And it was ruled that as the evidence was incompetent and improvidently admitted, the trial court did right in its exclusion even at that stage of the proceedings. See, also, to the like effect, *Sutton v. Johnson*, 62 Ill. 209; 2 Thompson on Trials, sec. 2354; 3 Rice, Evid. 225, 420; *Hangen v. Hachemeister*, 114 N. Y. *loc. cit.* 572; *Wright v. State*, 81 Ga. 745.

The conduct of the defendant is morally as reprehensible as though the evidence showed him to be legally guilty of the crime alleged against him. But though he can not be punished for that offense, yet if he was aware at the time of the illicit connection with his sister-in-law, though she was willing thereto, that he was infected with the venereal disease, her consent to the sexual act would be abrogated by the fraud practiced upon her, and would consequently constitute the sexual act an assault, for which he may be punished as and for a common assault. The rule regarding this point may be stated in short terms to be that an assault is within the rule that fraud vitiates consent. *Reg. v. Bennett*, 4 F. & F. 1105; *Reg. v. Sinclair*, 13 Cox C. C. 28; *Com. v. Stratton*, 114 Mass. 303.

The charge of rape necessarily includes within it a charge of assault and battery, and under our statute

and rulings a party charged with the former may be convicted of the latter. *State v. Webster*, 77 Mo. 566; *State v. Schloss*, 93 Mo. 361; *State v. White*, 52 Mo. App. 285; *State v. Karnes*, 51 Mo. App. 293; *State v. Phipps*, 34 Mo. App. 400; R. S. 1889, sec. 3950.

It has been ruled in England that where a girl has been infected by a party knowing his own condition, and she ignorant of it, he may be convicted of an assault and of doing her great bodily harm. *Reg. v. Bennett, Reg. v. Sinclair, supra.* In consideration of these authorities, and of the heinousness of the conduct of defendant, it may be well to call attention to section 3491, Revised Statutes 1889. The judgment should be reversed and the cause remanded.

I deem it proper to add some additional observations to my foregoing opinion which, though concurred in in division by BURGESS, J., that there was no rape, has been rejected *in banc*.

*a.* The physical facts in this case, as already related, show that no rape was committed. The upstairs rooms were occupied by the father and mother of defendant and in the room immediately adjoining was his wife. If the prosecutrix had screamed she must have been heard; that she did not scream is shown by the testimony of other witnesses, as well as by the surrounding physical facts; and we have repeatedly ruled, both in criminal as well as in civil cases, that neither courts or juries ought to stultify themselves by believing a witness whose testimony is shown to be in irreconcilable conflict with incontestable physical facts. *Payne v. Railroad*, 136 Mo. *loc. cit.* 584. And when a witness testifies in the face of, and in opposition to, obvious physical facts, such testimony is not to be credited even when sanctioned by the verdict of a jury. *I b.* 585.

For these reasons, however reprehensible the conduct of defendant may have been from a moral standpoint, I do not believe that he was guilty of the crime of rape.

*b.* I have cited some cases from our own reports as well as from other States, showing that where irrelevant evidence is inadvertently or improvidently admitted, it is competent and proper and the duty of the trial court to exclude it on motion at any time before the cause is finally submitted to the jury. Chief Justice MARSHALL, when presiding at Burr's trial, thought this was good law.

In *State v. Hope*, 100 Mo. 347, the ruling of this court in *State v. Cox*, 65 Mo. *loc. cit.* 32, on this point was overruled, and although not mentioned, the case of *State v. Owens*, 79 Mo. *loc. cit.* 631, was also overruled, as well as the earlier case of *Bank v. Murdock*, 62 Mo. *loc. cit.* 74.

The majority opinion in upholding *State v. Hope*, *supra*, not only overruled the cases and authorities already mentioned but also overrules, without mentioning them, the following cases of later date: *State v. Robinson*, 117 Mo. *loc. cit.* 664; *State v. Welsor*, *Ib. loc. cit.* 579, which were *unanimous* opinions. Hereafter, when evidence is improvidently admitted there will be *no way of excluding it under the ruling made in this case.* But it is somewhat curious to note that *State v. Hope* was virtually overruled, though nothing was said about it, in *Heinrich v. City*, 125 Mo. *loc. cit.* 429, where it was said, per BLACK, P. J., who had *concurred* in *Hope's* case: "It is true the court heard some evidence as to the value of this strip of thirty by sixty feet taken by itself, but no objection was made to it, until long after it had been admitted and no motion was made at any time to strike it out. The evidence

having been received without objection, the plaintiff should have moved to exclude it." And in this opinion all in Division One concurred.