## NANNIE WILLIAMS, Respondent, v. JAMES COLLINS, Appellant.

### Kansas City Court of Appeals, May 18, 1914.

1. **RAPE: Damages: Evidence.** In a civil action, although founded on the alleged commission of a heinous crime, the plaintiff is not required to prove the basic charge beyond a reasonable doubt, but is required to support the charge by substantial evidence, which if accepted by the triers of fact, would justify the conclusion, as a reasonable inference, that the crime has been committed as alleged.

2. **EVIDENCE: Uncorroborated: Rape.** While our courts sanction the rule that the charge of rape, because of the nature of the crime, may be sustained by the testimony of the woman alone, they analyze her testimony with care, and, if it be found inconsistent with physical law or human nature, do not hesitate to reject it as unworthy of belief.

3. ———: ———: ———: **Disclosing of Assault.** The fact that a woman does not disclose the assault within a reasonable time is a circumstance bearing upon the plaintiff's credibility, and the general merits of her case, that was proper for the jury to consider.

Appeal from Andrew Circuit Court.—*Hon. A. D. Burnes,* Judge.

AFFIRMED.

*Robt. L. Minton, Hine & Cross, Shinabarger, Blagg & Ellison* for appellant.

*John W. Stokes, Francis Wilson* and *T. C. Dungan* for respondent.

JOHNSON, J.—This is an action to recover actual and punitive damages for the alleged rape of plaintiff by defendant on the night of October 15, 1910. The petition was filed in the circuit court of Holt county March 24, 1911, and a mistrial occurred at the August term. The cause then was sent to Andrew county on a change of venue and a trial in that county resulted in a verdict and judgment for plaintiff for three thousand dollars actual and two thousand dollars punitive damages. Defendant appealed.

Plaintiff, a spinster forty-six years of age, lived with her elder sister, a widow, in Fairfax and assisted her in keeping a small boarding house. Defendant, a wealthy farmer fifty-five years old, had been a widower two years and after the death of his wife, had lived at the boarding house until he sold his land near Fairfax and bought a farm near Mound City, to which he removed. After his removal he made visits to Fairfax and on such occasions boarded with plaintiff's sister whose deceased husband was the uncle of his deceased wife. Plaintiff and her sister had known defendant many years and were on the most friendly terms with him. The sister in writing to him called herself his aunt and on two occasions, before the break in their friendly relations, plaintiff had sent him picture cards on which she addressed him in a familiar tone and called herself his "baby friend." In explanation of her use of this diminutive, she states it was a pet name he sometimes applied to her in the presence of her sister and the boarders. Further she states that she and her sister cherished a sisterly affection for him which she often manifested in the performance of such intimate feminine offices as buttoning his collar and mending his clothes. Defendant's description of his relations to them places them in a more selfish and sordid

light. He states that shortly after the death of his wife plaintiff proposed marriage to him, and that she and her sister joined in a matrimonial campaign against him, and finding it unsuccessful, endeavored at different times and in various ways, to induce him to employ them as his housekeepers.

This testimony is contradicted by the sisters and its imputation of unworthy conduct and motives is not in harmony with the character of plaintiff as portrayed in the testimony of neighbors and friends who knew her intimately, some of them from childhood. In their description she and her sister appear as modest, industrious women of irreproachable character and reputation. Defendant lays no charge of immorality against her. He denies having had carnal knowledge of her and pictures himself as the unresponsive object of her marked matrimonial advances which, it should be noted were not so vigorous and distasteful as to deter him from giving the boarding house his patronage or from accepting her sisterly ministrations.

The sisters had four or five regular boarders—a young woman school teacher, a doctor and a hardware merchant and his wife—and quoting from the testimony of one of them, they "were a jolly crowd." Generally defendant slept in a room on the first floor opening into the kitchen; plaintiff and her sister occupied a bed in another room on that floor, while the regular boarders had rooms on the second floor. On the night in question the sister of plaintiff was in a neighboring town and plaintiff became the bed-fellow of the teacher but not until after the commission of the alleged offense which, plaintiff states, occurred in the room occupied by defendant who arrived late that afternoon on a train from Mound City. After supper he called on the neighbor who lived across the street and the other boarders dispersed, leaving plaintiff alone in the house. The doctor went to his practice, the merchant to his business and his wife and the teacher to a pic-

ture show. The wife of the neighbor visited by defend-
ant testified that he introduced his leave-taking by re-
marking, "I better be going, Nannie (plaintiff) is by
herself."

He returned to the boarding house between eight
and nine o'clock, conversed with plaintiff sometime and
then asked her to prepare his bed as he wished to retire.
Plaintiff states, "I went on in the bedroom to fix his
bed, left him sitting by the table, and when I got the
bed almost made up, just putting the pillows on, why
I turned around to leave the bed—I was between the
bed and the wall, folding-bed, I had no way to get out,
and he grabbed me. I asked him to let me loose and he
wouldn't do it, so I tried to get away from him but he
held me and wouldn't let me loose; he threw me down
on the bed and then he commenced pulling my clothes
up; I jerked one hand up and tried to put my clothes
down and he says, "No, you shan't put them down,"
and he grabbed my hands and held them that way,
and I couldn't get loose from him and had to be tor-
tured to death; he paid no attention to my words; he
kept on until he got through with me, and when I was
bleeding and torn so I couldn't get up he told me to get
up from there. I says, "I can't," I says, "You have
tortured me, you will have to finish me up." He took
hold of me and jerked me off the bed and shoved me
away and I hurt so bad I was almost ready to faint
and couldn't do nothing at all, I was frightened so I
didn't know what to do with myself, and I begged him
then to kill me. I throwed my hands up and I told him
to disgrace me as he had done was worse than death
at any time, to be treated in that shape, and he stood
there and laughed at me. Q. What was the expression
of his face at that time? A. He looked like a lion if I
could tell it—I never saw such a look on a man's face."

Plaintiff is five feet one inch tall, weighed 110
pounds and though small was strong and in good
health. Defendant is five feet, ten inches tall, weighed

about 170 pounds and was strong and vigorous. The fierce struggle which plaintiff says ended in her defeat and which defendant asserts did not occur at all, was attended, so she says, by the wounding of her sexual organs so severely as to cause profuse hemorrhage and to lacerate and bruise certain muscular tissues to the extent of producing a continuous condition of injury which only a surgical operation can possibly cure. According to the evidence of plaintiff the crime had hardly ended before the return of the merchant's wife and the teacher. Defendant had just passed from the bedroom into the kitchen when they surprised him there. The merchant's wife testified that they stopped abruptly at the kitchen door on observing the spectacle he presented. "His trousers were undone and he didn't have any coat or vest on, his suspenders were off his shoulders, he sat down in a chair as we entered, put his foot in his lap and commenced to untie his shoes." Of this incident defendant says he went into the kitchen and began taking off his shoes while plaintiff was in the other room making his bed, and that he had not otherwise undressed when the woman appeared at the door. Observing their hesitation, he called out "Come on in, girls," and they entered the room and remained a moment or two. The merchant's wife did not encounter plaintiff until twenty minutes later. She observed nothing unusual in her appearance except that "her face was red, as red as it could be, like she had cooked for harvest hands over a red hot stove."

While defendant denies being guilty of any impropriety in his conduct that night, he insinuates into his version of his conversation with plaintiff the idea that she made covertly lustful suggestions for him to take advantage of her sister's absence, that she pointedly told him she intended to sleep alone in an adjoining room and offered to mend a rent in his trousers, and that he ignored the first suggestion but accepted the

latter offer and on retiring left his trousers near the door of his room where she found them and after the needful mending was done, returned them to his room.

The school teacher, introduced as a witness by defendant, testified that on returning to the house, she and her companion found defendant sitting in the kitchen taking off his shoes, that afterward she met plaintiff in whose appearance she observed nothing out of the ordinary; that plaintiff spoke of sleeping downstairs but accepted her invitation to become her bedfellow, and that before retiring she brought defendant's trousers to the room and mended them. Plaintiff denies telling defendant where she intended to sleep, or anything else from which an immodest invitation might be implied, and also denies *in toto* the story about the trousers. She made no mention of the crime and the next morning prepared and served breakfast for the boarders without exhibiting any change of demeanor towards defendant who left the house after breakfast and returned to Mound City. Plaintiff states that in addition to the physical injury we have mentioned, her hip was severely and painfully hurt when defendant threw her on the bed and that her physical pain and anguish of mind prevented her sleeping that night and caused her to weep the whole night long. The teacher stated she knew nothing of this distress but on cross-examination admitted that plaintiff might have cried all night for all she knew and that afterward she observed that plaintiff had become despondent. We quote from the testimony of this witness who appears to be unfriendly to plaintiff.

"Q. Did you ever see her crying there after the 15th? A. I think possibly I did. Q. How often, Miss Ellis? A. I couldn't say how often. Q. You say that towards the last, while you were staying there—you stayed there until the first week in January? A. First or second week. Q. And towards the last she seemed to be despondent all the time? A. Yes, sir. Q. There

was a marked change in her physical and mental condition, wasn't there, from the time you first knew her? A. I shouldn't call it a marked change. Q. It was such a change that you could notice it? A. It was a noticeable change.''

That a profound change became apparent in plaintiff from that day is testified to by a number of witnesses who knew her intimately and came into frequent contact with her. She had been in good health and of cheerful and even gay demeanor. She became greatly depressed and sorrowful, subject to nervous demonstrations bordering on hysteria, and exhibited signs of failing physical health. She kept the cause of her obvious mental distress a secret until in the following January, when in one of her nervous attacks of weeping, she revealed it to her sister. The reason she gives for delaying the revelation is that ''I was disgraced and I was afraid to tell it, afraid he would kill me; I feel like I am disgraced now.''

In December following the injury plaintiff and her sister decided to remove to Excelsior Springs and, ignorant of the cause of plaintiff's condition, the sister wrote defendant a letter asking him to visit them before their departure and reminding him of a promise of financial assistance he had given her. The letter was written and sent without the knowledge of plaintiff. After receiving plaintiff's confidence, the sister, under date of January 11, 1911, wrote defendant ''I wish to see you on special business just as soon as you can get here.''

Defendant answered that letter in person, and had a stormy interview with the writer and plaintiff in which they charged him with the crime and he rejoined with an accusation that they were trying to blackmail him.

After this incident they removed to Excelsior Springs. Counsel were employed by plaintiff and, as stated, this suit was commenced in the following

March. In May, two doctors were employed to examine plaintiff who was suffering from the results of the physical injury she states she sustained in the encounter with defendant. One of the doctors testified: ''I made a vaginal examination  .  .  .  found two lacerations on the side of the base of the vulva, the lower part, a slight tear on each side, probably not more than a quarter of an inch and a discoloration around the urethra.  .  .  .  The hymen was ruptured.  .  .  . There was a slight discharge  .  .  .  might be from laceration, might be from leucorrhea  .  .  .  when I examined her she was very nervous, crying, hysterical.'' The other doctor testified to the same condition and both expressed the opinion that the injury could have been caused by an assault in the preceding October of the character of that described in the evidence and that such lacerations, no matter how simple they are, should be repaired to get positive permanent results.'' The inability of nature to repair them is said to be due to the structure of the sphincter muscles which tends to prevent a union of the lacerated parts and to produce a stubborn ecchymotic condition of the injured area.

Physicians introduced as expert witnesses by defendant express the contrary opinion. They say that the coition of adults cannot result in a laceration of the vulva; that the tendency of nature is to repair such lacerations and that had plaintiff been injured at the time and in the manner claimed, all ecchymotic signs of such injury would have disappeared long before her physicians examined her.

A woman who was an intimate friend of plaintiff and her sister was visiting them and was present and witnessed the examination. She said, ''She was very badly torn and was very raw  .  .  .  as raw as a piece of beef.'' The sister of plaintiff also was present and corroborates this testimony.

A number of witnesses testified to observing the great change in plaintiff that began to appear almost immediately following the time of the alleged assault. Indeed, there is no contradiction of this evidence, the nearest approach to contradictory proof being the testimony of the teacher we have quoted. Plaintiff states that during the struggle with her assailant she cried out and beseeched him to desist. She does not know whether or not she screamed, so great was her preoccupation and terror. The weather was cold, the doors and windows of the house were closed and the nearest neighbor lived across the street in a house 125 feet away. The doors and windows of that house were closed and there is room in the evidence for the conclusion that had plaintiff resorted to screaming in her defense, it would not have brought her assistance. We have stated the facts of the case thus fully and circumstantially because of the earnest and powerful argument of counsel for defendant in support of their contention that the case should not have been sent to the jury. Their argument may be separated into two main propositions, i. e. *first,* that the evidence of plaintiff, when analyzed in the light of all the conceded facts and circumstances, is so inherently weak, so opposed to natural law and human impulse as to be unbelievable and, therefore, devoid of probative force, and, *second,* that the evidence shows beyond dispute that these sisters, in whom defendant himself professed and exhibited the greatest confidence and who were respected and honored by their friends and neighbors, were attracted by his wealth into a wicked scheme to ensnare him, by fair means, if possible, by foul, if necessary, into sharing his wealth with them.

Before proceeding to an analysis of the evidence we deem it important to restate the legal principles and rules applicable to cases of this nature which obtain in the jurisprudence of this State and are found sufficient for the needs of our inquiry.

Though this is a civil action, it is founded on the alleged commission of a heinous crime and while plaintiff is not required to prove the basic charge beyond a reasonable doubt, she is required to support the charge by substantial evidence, which, if accepted by the triers of fact would justify the conclusion, as a reasonable inference, that the crime had been committed as alleged. [Champagne v. Hamey, 189 Mo. l. c. 729.] Our courts have uniformly shown a disposition to heed the admonition of Lord Hale that rape "is an accusation easily to be made, hard to be proved, and still harder to be defended by one never so innocent." [Linville v. Green, 125 Mo. App. l. c. 300.] The temptation to a woman who has been debauched to excuse her own wrong at the expense of her guilty partner is very great, especially in instances where the offense no longer may be kept secret. On the other hand, the invariable defenses of the ravisher are that he had no carnal knowledge of his accuser or, if this defense be found unavailing, to resort to the counter accusation that she consented to her spoliation.

While our courts sanction the rule that the charge of rape, because of the nature of the crime, may be sustained by the testimony of the woman alone (Champagne v. Hamey, supra), they analyze her testimony with care and if it be found inconsistent with physical law or human nature, do not hestitate to reject it as unworthy of belief. Many illustrative cases are in the reports but reference to two of them will suffice.

In Robinson v. Musser, 78 Mo. 153, a woman who was sleeping in bed with a daughter of her alleged assailant, permitted him, while she was awake, to lift her from the bed and carry her to another part of the house without making any outcry, and in Champagne v. Hamey, the woman permitted herself to be ravished under circumstances where she had but to call aloud to bring speedy rescue. In both cases the Supreme Court held that failure to give the alarm, which was shown

not to be the result of inability to speak or scream, was positive proof of the consent.

We referred to that rule in Linville v. Green, supra, but pointed out that it was not intended to be given a Procrustean application in all cases and that the circumstances of the assault might be such as to excuse the assaulted woman from any imputation of guilt from her failure to make use of woman's most potent means of defense.

Further the rule is recognized that ordinarily, but not invariably, a normal woman who has been ravished will hasten to confide her injury to her nearest and dearest friend, but in this State, that rule never has been carried farther than to raise an issue of the veracity of the plaintiff or prosecuting witness, for the jury to solve. [See Champagne v. Hamey, supra, and cases reviewed.] We know of no case where the testimony of the accuser has been rejected by the court on that ground alone. As was said by the Court of Appeals of New York in Young v. Johnson, 25 N. E. Rep. 365, cited with approval in Champagne v. Hamey, the fact that the woman does not disclose the assault within a reasonable time and until she approaches the most embarassing situation in which a woman can be placed, is "a circumstance bearing upon the plaintiff's credibility, and the general merits of her case, that was proper for the jury to consider."

The rules we have discussed are pertinent to the questions raised by defendant on his demurrer to the evidence and in applying them to the facts of the instant case we must have regard for the rule requiring the court, in passing on a demurrer to the evidence, to draw every reasonable inference in favor of the plaintiff the evidence will permit. Our duty in such cases is not to weigh and compare conflicting evidence but merely to ascertain whether or not the evidence most favorable to the plaintiff has probative value and is

endowed with sufficient substance to raise a debatable issue of fact.

Two circuit judges of wide experience and great ability presided at different trials of this case and with the advantage of meeting the parties and witnesses face to face, each decided the legal issues presented by the demurrers in favor of plaintiff and held that her evidence was of sufficient reasonableness and force to take the case to the jury. And the jury, enjoying the same advantage, found that her evidence not only was reasonable and substantial, but outweighed the opposing evidence on all essential points. We share the feeling expressed in the following quotation from the opinion of the Court of Appeals in Dean v. Raplee, 145 N. Y. l. c. 325:

"When such a case arises who is to determine when, as in this case, the girl, in stating the occurrence, states that she did not consent and did resist to the best of her ability, whether she tells the truth or not? Can this court, after the jury have accepted plaintiff's version of the transaction and the general term has approved the verdict say, as matter of law, that there was no evidence for the consideration of the jury? This, I think, would be to transcend the limits of our jurisdiction as a court of law, without power to review disputed facts. Whatever we might think of this case, if we had the power to determine the facts, I think we cannot say, as matter of law, that it was impossible for the jury to take the view of the case that they did."

We are not unmindful of the rule which makes an appellate court the final arbiter of the issue of whether or not the evidence of a party has probative value and are not bound by the judgment of the trial court on such issues. But in cases such as the present, where as a rule there are no witnesses to the alleged crime, the advantage enjoyed by the triers of fact in confronting and observing the parties, obviously is greater than in other cases and affords a more useful test in

solving the question of the reasonableness of the testimony of the plaintiff, concerning matters of which she and the defendant alone have knowledge.

It should be observed that plaintiff's testimony stands alone only as to the alleged physical assault and rape. As to all other prior and subsequent events and circumstances which have an evidentiary bearing on the issue of the true nature of the alleged encounter, she is corroborated by the testimony of unimpeached and obviously unimpeachable and disinterested witnesses.

That she was a virtuous, modest, industrious woman, enjoying the respect and confidence of her neighbors and acquaintances, is a fact about which there can be no dispute. That the death of defendant's wife inspired her with matrimonial hopes which she evinced to defendant in ways within the bounds of propriety and natural impulse may be conceded; that defendant has enlarged upon her innocent attempt at courtship and tried to impart to it a sinister cast, is an inference fairly to be drawn from all the facts and circumstances in proof. Despite his assertion that she pursued him in various ways with the object of establishing some closer relationship between them that would be to her pecuniary advantage, his own conduct towards her before the event in controversy lends support to the view that a reciprocal courtship had been in progress for some time between them which was honorable, at least, on her part. Defendant has deftly employed, in his defense, the fact that a poor spinster aspired to be the consort of a rich widower as supporting his role of the innocent victim of an adventuress. The trial court heard these charges and insinuations, observed the accuser and accused, weighed all the facts and circumstances appearing in evidence and properly held that it was for the jury to decide that issue as one of fact.

There is ample and disinterested evidence tending to show that defendant's conduct that evening was ordered to serve the purposes of a lascivious design for which the absence of plaintiff's sister and the boarders from the house gave a fitting opportunity. He left the house before the other boarders but knew that all of them would be away and plaintiff left alone. The testimony of the woman who lived across the street, who is a disinterested witness, establishes that fact. He returned to the house expecting to find plaintiff alone and when he would be justified in believing that none of the boarders would return for some time. There is no inherent weakness in the testimony of plaintiff relating to what occurred after his return. He was a large and powerful man, she a small woman, greatly inferior to him in strength. It is reasonable to infer that he could ravish her despite her utmost resistance and that the bitter struggle her wiry strength permitted her to make would cause her ravishment to be attended by physical injuries of the nature of those she says she suffered. The physicians who testified at the instance of defendant say that such injuries could not be caused by the act of coition between adult persons. But considering the facts of the age, size and virginity of plaintiff, that she had passed the second great climacteric in a woman's life and that she was attacked with the utmost ferocity and recklessness by a large and powerful man, we think other elements than those of peaceful and willing copulation enter into the question of whether or not plaintiff could have suffered lacerations of the vulva in the assault and that the court did not err in submitting that issue to the jury as one of fact.

In determining whether or not an event said by witnesses to have occurred is so opposed to physical law as to be unbelievable by reasonable minds, courts should not go beyond the realm of common, as distinguished from scientific, knowledge. We have before

Williams v. Collins.

us conflicting expert opinion on the issue under consideration and we hold that common knowledge of the laws invoked does not contain an absolute and indisputable solution of the issue which, as we have said, is purely one of fact and not of law.

Another important consideration in the application to the evidence of legal tests of veracity is that the evidence, as a whole, strongly tends to contradict and discredit defendant in his vehement assertions that nothing improper took place between him and plaintiff. The testimony of the wife of the merchant as to what she observed in the appearance of the parties on the return of herself and her companion strongly tends to show that some sort of an improper encounter had recently taken place between the parties and, on the hypothesis that defendant has not told the truth about what occurred while plaintiff and he were alone in the house, the jury were entitled, not only to disregard the whole of his testimony but, believing him to be foresworn, to treat his false testimony as a confession of guilt. An innocent and honest man unjustly accused of a detestable crime does not resort to falsehood in his defense. Innocence instinctively flies to truth as its best defender while guilt as surely seeks the companionship and aid of falsehood. We are not to be understood as denouncing defendant as a purjurer but as holding that there is reasonable and credible evidence in the record from which the jury well might have drawn such inference and to have treated the testimony of plaintiff as though it were uncontroverted by testimony from him.

That plaintiff suffered a physical injury at or near the time of the alleged rape is a fact the evidence may be said to remove from the field of controversy. The doctors who examined her, the woman who witnessed the examination, as well as plaintiff and her sister, testify to a condition pointing to a traumatic origin and the doctors express the expert opinion that the in-

jury could have been caused at the time and in the manner stated by plaintiff. In addition to this, and of strong evidentiary significance, is the uncontradicted testimony of a number of witnesses to the fact of the great change wrought in her, both physically and mentally, by what must have been a shock of the most profound nature and consequence. Such facts cannot be said to be at variance with natural law and are strongly corroborative of plaintiff's version of the cause of the deplorable condition she was in at the time of her examination, since such condition could not have had its genesis in a liaison and is inconsistent with the theory of consent.

Much stress is laid by counsel for defendant on the fact that she did not consult a physician before her removal from Fairfax and when she did it was only for the purposes of this suit, but these were facts relating to her credibility which were properly referred.

Counsel appear to think that she should be condemned for not making a greater outcry, but this, likewise under all the evidence cannot be considered otherwise than as a circumstance for the jury to consider. [See Linville v. Green, supra.]

In our discussion of the rules of law we have shown that the failure of plaintiff to disclose her shame, even to her sister, until almost three months had passed, would not justify us in holding that she consented to the embraces of defendant, and when proper consideration is given to all the facts and circumstances of her situation, we can perceive reasons for her conduct which seem to reconcile it with the common impulses of feminine nature. At first she did not realize the severity of her physical injuries nor the extent of the shock she had suffered and it would be unjust to hold that one who has been so violently jarred out of the orbit of her normal being must conform to rules of nor-

mal conduct. It was for the jury to say whether or not, in keeping the secret so long, she violated an invariable canon of female chastity.

The demurrer to the evidence was properly overruled.

Objections to rulings on evidence have been examined and are found to be not well taken. The case was fairly tried and we find no ground for disturbing the verdict and judgment.

Affirmed. *Ellison, P. J.,* and *Trimble, J.,* concur in separate opinions.

## SEPARATE CONCURRING OPINION.

TRIMBLE, J.—After a careful study of the record and of all the authorities cited, and many others in addition thereto, I am driven to the conviction that we are without authority to interfere with the verdict, and, therefore, concur in the affirmance of the judgment. The jury are the judges of the evidence in an action for rape as in any other case. It is only when the appellate court can say that, taking all the evidence and circumstances into consideration, there is no substantial evidence to support plaintiff's charge, that we can nullify the finding of the jury. And in all the cases I have examined, where the judgment was reversed outright, it will be found that the courts did so, not simply because the woman failed to complain immediately thereafter, but because her charge was unsupported by the surrounding and conceded facts; and her admitted conduct contradicted her claim that the act was against her consent. In other words, although she said with her lips that she did not consent, yet by her admitted conduct, she said she did consent. In such event, there being nothing but her bare word to support the charge, the reviewing court could well say there was no substantial testimony offered in her behalf. In the celebrated Musser case (78 Mo. 153), for example, al-

though the woman said with her lips that she did not consent, yet, by allowing herself to be taken quietly and without resistance from the side of, and without disturbing, her sleeping female companion, out of her room down a flight of stairs through a long hall, into defendant's room and placed in his bed, all in a house occupied at the time by others, she said far more emphatically that she did consent.

In the Champagne case (189 Mo. 709), the charge was wholly unsupported by any results attending an occurrence of that character, such as laceration of the parts, signs of violence, etc., and there was nothing to show the physical condition and mental anguish which ordinarily follow. It was simply the *bare word* of the girl, and her word was directly contradicted by her conceded actions. The court said: "The statements of plaintiff as to this occurrence must be viewed in the light of all the surrounding facts and circumstances. If the physical facts and all the circumstances appearing in evidence, together with the surrounding conditions, absolutely negative and destroy the force of such statements, then, in contemplation of law, such statements do not amount to any substantial evidence of the facts to which they relate."

In the cases of State v. Brown, 209 Mo. 413, and State v. Tevis, 234 Mo. 276, the charges were not only unnatural (between parent and child), but they were also wholly unsupported by any attendant circumstances, and the evidence of the prosecutrix in each case was of a contradictory nature. In the Tevis case the court at page 284 said: "A conviction in cases of either incest or rape may be had upon the uncorroborated evidence of the prosecutrix, but when the evidence of such prosecutrix is of a contradictory nature, or when applied to the admitted facts in the case, her testimony is not convincing, but leaves the mind of the court clouded with doubts, she must be corroborated, or the judgment cannot be sustained."

In the case of State v. Goodale, 210 Mo. 275, the reputations of the girl and her mother were bad both for truth and chastity, there was nothing to support the charge except the bare word of the girl, and not only was there no evidence of the act upon the girl's person but there was testimony of a physician who examined her that "there was nothing to indicate that she had been foully dealt with." In addition to all this, the conceded actions of the girl and her mother were wholly contradictory of her oral claims. The court said: "No man ought to be incarcerated in the penitentiary upon such an unnatural and unreasonable story, wholly unsupported, as it is, by any fact or circumstance corroborating it."

In not a single case either in this or in other states, coming under the writer's notice, has a reviewing court held that failure to complain, *alone and of itself,* is sufficient to conclusively show consent. It must be remembered that in this case the plaintiff is corroborated in her statement of the surrounding and attendant circumstances, even by the defendant himself, except as to what took place between them. But, as said in the main opinion, undoubtedly something took place between them when they were alone in the house that night. The defendant says he did nothing. The plaintiff says he did, and that it was by force and against her will. And there is no evidence that plaintiff consented, unless consent is implied in the fact that she said nothing about it until the condition of her lacerated parts compelled her to reveal it. And unless mere failure to complain *conclusively shows consent,* notwithstanding the presence of other corroborating facts and circumstances, we are *without authority* to interfere with the jury's verdict. Now, as stated above, there is no case holding that mere lapse of time between the offense and complaint conclusively shows consent, or destroys the charge, as matter of law. On the other hand, lapse of time between offense and complaint is *matter for*

*the consideration of the jury* in determining whether such delay is consistent with the testimony of the prosecutrix. And, where there has been delay, the jury are instructed that, although the prosecutrix failed to complain, this fact alone will not prevent recovery or conviction provided the jury believe from the evidence that defendant did commit the act charged. And all the cases say failure of the victim to complain immediately is to be considered as *tending* to show consent on her part. That is, it does not show it *conclusively*, but is a circumstance *tending* to show it which the jury should consider. As said in State v. Byrne, 47 Conn. 465, "where a considerable length of time has intervened between the commission of the offense and the statement, this fact, *with all the circumstances,* is to be considered by the jury in weighing the evidence." In that case there was 18 months delay. In State v. Reid, 39 Minn. 277, 1. c. 281, it is said: "It is laid down very generally that if the complaint is not made without any inconsistent delay, it is a strong, but not conclusive, presumption against the truth of the charge." In State v. Knapp, 45 N. H. 148, it is said that the unexplained silence of the prosecutrix for a considerable time is calculated to cast suspicion upon her testimony and seriously affect her credibility. This, of course, means that the question is still one for the jury. "In case of rape, if the party raped conceal the fact for any considerable time after an opportunity to complain, except from fear, this and like circumstances afford a strong, *though not conclusive,* presumption that her testimony is feigned." [Citing 1 Hale, 633-635. Higgins v. People, 1 Hun. (N. Y.) 307.] "Any considerable delay on the part of the prosecutrix to make complaint of the outrage constituting the crime of rape, is a circumstance of more or less weight depending upon the other surrounding circumstances. [People v. O'Sullivan, 104 N. Y. 481.] In the case of State v. Peter, 8 Jones (N. C.) 17, where no complaint was

made for two weeks, the court said: "It is not a rule of law that silence, under such circumstances, raises a presumption that the witness has sworn falsely. The passages in the books, to which reference was made on the argument, use the word, "presumption," not as a rule of law, but an inference of fact, and treat of silence, as a circumstance tending strongly to impeach the credibility of the witness on the ground that a forcible violation of her person so outrages the female instinct, that a woman, not only will make an outcry for aid at the time, but will instantly, and involuntarily, after its perpetration, seek some one to whom she can make known the injury and give vent to her feelings. The want of this demonstration of feeling or 'involuntary outburst,' is treated of as a circumstance tending to show consent on her part; but it is nowhere held that this female instinct is so strong and unerring as to have been made the foundation of a rule of law, as distinguished from a rule in respect to evidence, and the weight to which it is entitled; which is a matter for the jury." In Turner v. People, 33 Mich. 382, it is said that concealment of the injury for any considerable time after the woman has opportunity to complain is one of the circumstances having a strong tendency to show that her testimony is false or feigned. In State v. Cross, 12 Iowa 66, l. c. 70, the court said, in speaking of the failure to make outcry and complaint, "while the absence of such outcries and complaints tend strongly to rebut the hypothesis of guilt, they are by no means conclusive. Her credibility is to be left to the jury, and these and other circumstances are to be left to their consideration. And the same is true, as to the fact that her garments were not torn, and bore no evidence of injury. If nothing of this kind appears, the jury should, from the peculiar character of the case, hesitate long before conviction. The virtuous female, who has in fact been thus injured, will not ordinarily omit to make known by her cries

the threatened crime; will not be overcome without
more or less injury to her garments; will not suffer
in silence and without, as soon as practicable, making
known this greatest of wrongs to her person. And
yet the jury may conclude, *under some circumstances,*
that she speaks the truth, and that the crime was com-
mitted, though all these circumstances be wanting.''
(Italics ours.) And to the same effect is a host of
cases too numerous to cite but which may be easily
found by a patient and persistent search. It is true,
in many of the cases where such remarks are found,
there were reasons given why the complaint was not
made sooner. But the remarks show that mere failure
to complain, alone and of itself, is not conclusive of
the defendant's innocence. And in many other cases
the reasons given for not making complaint were no
stronger than those given in the case at bar, namely,
fear of the defendant and the dread and horror of
being involved, before the public, in such a shameful
and indecent transaction. That mere failure to com-
plain does not arise to the dignity of a rule of law
forbidding recovery is shown by 4 Blackstone 211. He
states that the laws of Scotland and Arragon required
that complaint must be made within 24 hours and that
afterward by statute the time in England was extended
to 40 days, but that at the time he wrote, there was no
time of limitation fixed, ''but the jury will rarely give
credit to a stale complaint.'' And on page 213 the
same author says that the person ravished is a com-
petent witness, ''but the credibility of her testimony,
and how far forth she is to be believed, *must be left to
the jury upon the circumstances of fact that concur
in that testimony.*'' He then goes on to say that if
she be of good fame, if she presently complained, etc.,
''these and the like are concurring circumstances which
give *greater probability* to her evidence. But on the
other side, if she be of evil fame, and stand unsup-
ported by others; if she concealed the injury for any

considerable time after she had opportunity to complain; if the place where the fact was alleged to be committed was where it was possible she might have been heard, and she made no outcry; these and the like circumstances carry a strong *but not conclusive* presumption that her testimony is false or feigned.''

It is needless to go further in the search for authorities in support of the view that the question in the case at bar was one solely for the jury to determine. In this case the woman was of good reputation, there is no question but what defendant and she were alone in the house that night and that something did occur there which profoundly affected her mental and physical nature to such an extent as to be noticed by all who knew her whether favorable to her side or not, and that whatever it was had its origin that night. Several persons examined her private parts and testify as to their lacerated condition, and two doctors say it could have been produced in the way she says it was. There is no charge that she consented to the intercourse. She says she resisted and made outcry as loud as she could. The fact that she was not heard does not disprove her story when the nearest house was across the street and the doors and windows of both houses were shut and the other persons doubtless absorbed in their own affairs. The evidence that the muscles of her private parts were ruptured and will not heal as a result of the intercourse is not inherently so impossible or improbable as to be unbelievable when her age and her slight size, the power and build of the defendant, the haste and ruthless fury with which the act was consummated, and the fact that she was a virgin intact are all considered. The effects produced by the ordinary act of copulation by which the human race is perpetuated are not safe criteria by which to judge, *ex cathedra,* what would necessarily result to this woman's private parts under the circumstances

of a forcible ravishment. For all these reasons I am constrained to agree to an affirmance of the judgment.

## CONCURRING OPINION.

ELLISON, P. J.—I agree to an affirmance of the judgment notwithstanding a large part of plaintiff's case is not worthy of belief. But some of it is not of such character that an appellate court could say it is false, as a matter of law. To illustrate: the law recognizes the binding effect of a verdict, though the jury finding it may believe a large part of the story of witnesses is wilfully false. It is common to instruct a jury to the effect that if they find perjury has been committed in material parts of the testimony of witnesses, they are at liberty to reject the whole of it, but are not compelled to do so. So if it be conceded that plaintiff's story that there was a sexual connection without her consent, may reasonably be believed by a jury, we may reject most of what remains as imaginative garnishing, or horrifying adornment, and yet leave her with enough to make out a case in an appellate tribunal.