State v. Barbour.

---

THE STATE v. G. H. BARBOUR, Appellant.

Division Two, May 23, 1911.

1. **RAPE: Non-Consent: Resistance.** Non-consent is proven in a rape case where there is evidence that the woman made all practicable resistance to the ravisher. The resistance to be expected depends much upon the physical strength of the woman, the circumstances, and her knowledge of the defendant's reputation for violence and immorality.

2. ———: ———: **Fear.** A consent induced by a fear of personal violence is not consent.

3. ———: ———: **Question for Jury.** A verdict based on substantial evidence will not be vacated on appeal on the ground of contradictory testimony. Three or four months before her baby was born, the defendant, who was a practicing physician, made an improper proposal to the young wife, which she immediately communicated to her husband at work in the field. As the time of her confinement approached she objected to being attended by defendant, but on the advice of her mother, who considered him skillful in such cases, she consented that he might attend her. Three weeks after the birth of the child her husband, going on a long journey in taking the nurse to her home, met defendant in the road, on his way to visit professionally another family who lived three miles from the home of prosecutrix. Defendant visited that family, then drove in the roundabout way that led by the house of prosecutrix. When he arrived there he called a small boy to hold his team, and

State v. Barbour.

went in the house where she was sitting in a rocking chair, holding her baby. She had at no time since its birth been able to sit up all day. He told her what he "wanted" and "would have." She knew his reputation for immorality and violence, and he knew of her bodily weakness. He took the baby from her, put it upon the bed, and threw his arms about her and drew her upon himself; he forbade her to make any outcry; he dragged her from the chair, and when, pulling away from him she escaped into another room, he dragged her back, and, against her pleadings to quit, pulled her down on a chair again, and as she would push her clothes down on one side he would pull them up on the other, and against her pushing and pulling, by his superior strength he pulled her down upon himself as he sat in the chair, penetrated her, and left immediately afterwards  He testified that the copulation was by her consent; that she said it was not right, but did not resist. The nearest neighbor lived a quarter of a mile away. She testified that the reason she made no outcry was because she was afraid of him. Her husband returned in two hours, found her in a state of nervous collapse and great anguish, and was immediately informed of defendant's conduct. *Held*, that there was substantial evidence that the prosecutrix made all the resistance of which she was capable in her weakened and terrorized condition, and did not consent to the carnal act, but that it was performed with force, and the court properly submitted the case to the jury.

4. Manner of Performance: No Outcry. No inference of a conclusive nature can be drawn from the absence of an outcry by the prosecutrix, nor from the fact that the carnal act upon the small and weakened woman was performed by defendant by pulling her down on himself as he sat upon a chair. At most they give rise to a disputable presumption, which the jury are entitled to draw or not to draw as they see fit under the circumstances in evidence.

## Appeal from Gentry Circuit Court.—*Hon. Wm. C. Ellison*, Judge.

AFFIRMED.

*Cook, Cummins & Dawson* for appellant.

(1) Under the law in this State before a conviction for rape can be had, the evidence must show the fact of non-consent, and the exercise of all the means of resistance which, under the circumstances of the

case and the condition of the mental faculties of the prosecutrix were within her power to make. State v. Cunningham, 100 Mo. 382; 10 Ency. Ev. 584. The resistance must be up to the point of being overpowered by actual force, or of inability from loss of strength to longer resist, or there must be duress or fear of death. State v. Patrick, 107 Mo. 171; Brown v. State, 7 Am. and Eng. Ann. Cas. 258. (2) An outcry and resistance are important elements of evidence, and a want of these circumstances, where they may be reasonably expected, go far to disprove the charge of rape. State v. Cunningham, 100 Mo. 382; Champayne v. Homey, 189 Mo. 723. The method of the signal act, as shown by the evidence in this case, can scarcely be credited unless consent were one of the ingredients. State v. Burgdorf, 53 Mo. 65; State v. Wilson, 91 Mo. 410. The evidence, as a whole, tends strongly to show that this is one of those cases where there has been a mutual gratification of desire and passions. Mere copulation coupled with passive acquiescence is not rape. 33 Cyc. 1424; State v. Burgdorf, 53 Mo. 65.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

It will be observed by the court that it is not claimed by counsel for appellant that there is no evidence to support the verdict, but that the verdict is only against the law and the evidence. In the case of State v. Espenschied, 212 Mo. 223, the court said: "It is only in case there is no substantial evidence to support the verdict that it will be set aside on such ground. The State's evidence made out a strong case of the crime of rape against appellant. It went much further than making a mere prima facie case, as is required. State v. Urspruch, 191 Mo. 47; State v. Ripey, 229 Mo. 666; State v. Dilts, 191 Mo. 676. The outcry is no necessary essential of the proof of the crime of

·rape. The failure to make it is only a fact for the consideration of the jury in weighing the evidence in such prosecutions. State v. Miller, 191 Mo. 612. The trial court quite properly submitted this cause to the jury. The verdict in this cause met the approval of that learned and just trial court who saw the witnesses and heard their testimony. State v. Ripey, 229 Mo. 670; State v. Payne, 194 Mo. 452.

BOND, C.—The defendant was convicted of rape in the circuit court of Gentry county and sentenced to five years in the penitentiary.

On the trial, the evidence showed that defendant was a practicing physician in King City, Gentry county; that he had resided there for several years after his release from the penitentiary, a few days before serving a full term of five years, to which he had been sentenced for manslaughter. The evidence showed that he had known the prosecutrix for a number of years, having been the family physician in her mother's family; that the prosecutrix, Mrs. Anna Brook, was married in her 18th year, about July 19, 1908; that in the spring of 1909, when the prosecutrix was advanced in pregnancy, the defendant made an improper proposal to her, which she immediately communicated to her husband in the field where he was at work; that as the time of her confinement approached, the question was discussed between the prosecutrix and her mother as to who should be called to attend her; that the mother suggested the defendant; that prosecutrix, Mrs. Anna Brook, objected; that finally her mother said to her, "He (the defendant) is good in cases of that kind; send for him then, but don't send for him any more;" that in pursuance of this advice of her mother, Mrs. Brook at the time of her confinement, on the 12th day of July, 1909, was attended by the defendant, and delivered of a child, and was

left in the care and nursing of her aunt, who agreed to stay with Mrs. Brook and her husband until she was recovered from the effects of childbirth; that about three weeks after that event, to-wit, on the 3d day of August, 1909, the occurrence for which the present indictment was found against the defendant took place, according to the evidence for the State, in the following manner: On said day Mrs. Brook's husband had left their home early in the morning to take the sick nurse back to her home; that he left his wife attended only by a little boy (his nephew), about eleven years old; that he was required to go about ten miles to reach the home of the sick nurse; that after he had gone several miles he met the defendant, who was driving a double team for the purpose of making a visit to a Mrs. Snapp. The evidence tended to show that after the defendant had made the visit in question, he went out of his way to return by the farm of Mr. Brook, husband of the prosecutrix; that he arrived there about half past nine o'clock, and observing the boy at the door of the house, called him and placed him in his buggy to hold his team, at a distance of about sixty feet from the front door; that he got a drink of water in the yard and then went in the house, where he found Mrs. Anna Brook, the prosecutrix, sitting in a rocking chair with her baby in her arms; that this was the third time she had been able to get out of bed, and at no time had she been able to sit up a whole day; that after the doctor entered the room, he approached her and said, ''Let me lift the baby and see if he has grown any;'' that he then got up with the baby and went to the door and looked up and down the road, north and south; that he came away from the door and laid the baby on the bed; that he then came to where the prosecutrix was sitting, and stood by and said, ''Come over here,'' and she said, ''No,'' and again said, ''No;'' that he then grabbed hold of her arm and took her out of the rocking chair; that she then got

loose from him and kept "begging him to quit," and pulled and jerked and got loose from him and started to walk away and got to the middle door, when he grabbed hold of her and says, "Come in here," and she said, "No," and he pulled her inside of the door; that he grabbed both of her arms, and she pushed and pulled and got away from him and went back in the room where the baby was; whereupon he stood back between her and the door, and he took the chair from against the door and set it back of the door and shoved the door around part way shut; and he said, "Come over here," and she said, "No," and he came over and grabbed her; that he took her from there to the place where the chair was; that she was trying to get loose from him and begging him to leave her alone; that he fell down on the chair and got down on the chair and pulled her down on him; that during the struggle he was pulling and trying to get her clothes up one side and the other. The prosecutrix then stated that he had intercourse with her, and, in referring to her resistance, testified as follows:

"Q. Well, what did you do? A. I put forth all the strength I had. I tried to get loose from him, and begged him to leave me alone, and tried to get loose from him, and I pushed.  ·  .  ."

That she was weak and scared; that her baby was only three weeks old; that she weighed only ninety-seven pounds; that defendant tore her undershirt and pants; and when he had accomplished his purpose, let go of her and said, "I guess I had better run;" that he picked up his hat, went out of the house and drove off.

The evidence showed Mrs. Brook was still suffering from the discharge resulting from childbirth; that about two hours thereafter her husband came home, and she told him of what had happened as quick as he got in the house. The prosecutrix testified that she made no greater outcry because she was afraid the doc-

tor would harm her. She was asked why she didn't call the little boy who was sitting in the buggy in the front yard. "A. Because I was afraid to. Q. Because you were afraid to? A. Yes, sir. Q. Why were you afraid to? A. From what I had heard of Dr. Barbour, I was afraid to." Testifying further, on cross-examination, the prosecutrix stated, as follows: "Now, why . . . Again, now, you say that you didn't call the little boy because you were afraid to? A. Yes, sir; I was afraid to. Q. Who were your nearest neighbors? A. Mr. Ed. Taylor's. Q. How far did he live from your house? A. About a quarter of a mile, I think. Q. A quarter of a mile? A. Yes, sir. Q. Why didn't you—why didn't you call to that little boy and tell him to drive as fast as possible to Mr. Taylor's and get help for you? A. Because I was afraid of Dr. Barbour." Adding further, "A. Yes, sir. He told me—he would say 'Hush' and, 'Be still.' Q. Now, why didn't you make further outcry when he told you that? A. Because I was afraid of him. Q. Because you was afraid of him? A. Yes, sir; I was so scared. Q. What was the tone of his voice when he spoke to you about that, as to being harsh or pleasant? A. It was harsh."

The husband of the prosecutrix testified that he got back home about half past twelve o'clock, when his wife informed him at once of what had happened. His testimony being, to-wit: "A. She informed me that Barbour had been out there and forced her. Q. And done what? A. And forced her. Q. What was her condition—mental condition—at that time, as to being cheerful or otherwise? A. She was just as nervous as she could be? Q. Well? A. I stepped in a room and picked up a paper, and stepped back in, and she laid down on the floor; and I said, 'Dear, what is the matter with you.' I found her as nervous as she could be, and all broke down, and crying and going on in anguish. Q. In anguish? She informed you then,

you say, of what had occurred? A. Yes, sir." He testified further: "Q. Tell the court and jury about the physical condition your wife was in at that time, as to being strong or otherwise? A. She hadn't been up all day at all since the baby was born. Q. Since the baby was born? A. No, sir."

The sick nurse testified for the State that Mrs. Brook at the time in question, 3d day of August, 1909, was still suffering from functional disorders, to-wit: "Q. Explain it to the jury now. Explain that to the jury—what the condition was—the jury here—these twelve men. Tell the jury about it, Mrs. Bolen. A. I say she was in a weakened condition—she still was. Q. Well, was she or was she not still wasting? A. Yes, sir, she was; if you must know, she was."

The prosecuting attorney testified that three days after this occurrence he met the defendant, Dr. Barbour, in company with Dr. McCaslin; "and Dr. Barbour spoke up, and he says, 'Was there a man up there to get a warrant out for me, the other day?' I looked him in the face, and says, 'Yes, sir.' He says, 'What was the charge, rape?' I says, 'Yes, sir.' Q. Well, now, what effect and what was the demeanor and what effect did it appear to have on him? A. Well, he turned very pale, and seemed very much agitated about the matter, and he says, 'I don't see how anybody could bring an accusation like that,' or 'what they would bring it for.' He says, 'I have got no money.' He says, 'They couldn't make any money out of me.' Q. Was that the extent of the talk? A. That was the extent of it—the size of it. Q. You may ask him. A. I left as soon as I could, yes."

The State introduced three witnesses who testified they had known G. H. Barbour for periods ranging up to eighteen years, and that his general reputation for morality was bad.

The defendant testified on his own behalf, that he had been a practicing physician in Gentry county since

the spring of 1882; that he had known Mrs. Brook six
or seven years; that he attended her at the time of
her confinement in July, 1909; that on August 3, 1909,
he had left King City to pay a visit to the residence
of Mr. Snapp, who had phoned him that his wife was
in a very bad condition; that on his trip he met. Mr.
Brook in a buggy with a lady; that after completing
his visit to Mrs. Snapp, he stopped at Mr. Brook's on
his way back to King City, although Mr. Brook's resi-
dence was not on the direct road from Mr. Snapp's;
that the first person he saw was a little boy, Edwin
Hall; that he inquired of the little boy, "Was Art got
back?" (meaning the husband of Mrs. Brook); that
his purpose in making that inquiry was to collect a
balance due him by Mr. Brook of five dollars; that he
had driven up to within forty or sixty feet of Mr.
Brook's house; that after alighting from his buggy
and going to the well in the yard to get a drink of
water, he spoke to Mrs. Brook whom he saw sitting
in a rocking chair in the house; that after some con-
versation with her, the act of copulation took place.
He was asked, "Q. What objection did she make?
A. Oh, she-she probably said it wasn't; that it wasn't
right, or something of that kind; and I think that after
—she made some, of course, little talk about that it
wasn't right to do that. I don't remember just exactly
the language that she used. But she— Q. Do you
remember whether she used the expression, 'quit,' or
something of that kind? A. Well, I wouldn't dispute
that—she might have said that—might have said that.
I wouldn't undertake to dispute that." He testified
further: "Q. Where did you take hold of her, Doc?
A. I think I put my right arm around her waist, the
way I remember it. Q. Your right arm around her
waist? A. She was leaning— By this time we were
getting mixed up considerable. I just took hold of
her. . . . Q. You aim for this jury to understand
that she got on your lap with her own free will and

accord? A. No, sir; I wouldn't say it was entirely with her own free will, but there was no resistance to—no struggle in the matter . ... . Q. She was naturally very weak, wasn't she? A. She wasn't very strong, no, sir.''

On his appeal to this court, the defendant makes only the following assignments of error:

1st. The verdict is against the law.

2d. The verdict is against the evidence.

3d. The verdict was the result of passion and prejudice on the part of the jury.

I. The propositions advanced in the brief for appellant in support of the errors assigned by him relate; first, to the necessity of showing non-consent; second, to the necessity of proving that all practicable resistance was made; third, the evidential force of a failure to make a great outcry; and, fourth, the inference arising from the manner of performing the sexual act.

It is apparent, therefore, that it is only necessary for us to announce the correct legal doctrine on these points and its applicability to the evidence given for the State, for if there was substantial evidence of the guilt of the defendant when tested by these rules, then the finding of the jury is conclusive.

It will be seen at once that appellant's first and second points are correlated, that is, non-consent is proven whenever there is proof that the woman made all practicable resistance to the ravisher. This has been well stated by BLACK, J., in State v. Cunningham, 100 Mo. l. c. 391, as follows: ''The State must, of course, show force used on the part of the defendant, and that the woman did not consent. These questions of fact are interwoven, and the one is somewhat dependent upon the other. Whether the woman did or did not consent to the act is, in most cases, to be inferred from the surrounding circumstances; and,

hence, resistance or want of resistance becomes an important element in the evidence. So, the resistance to be expected depends much upon the physical and mental strength of the woman. The distinctions between the facts to be proved, and the evidence adduced in proof of them, should be kept in mind. 'The importance of resistance is simply to show two elements in the crime: Carnal knowledge by force by one of the parties, and non-consent thereto by the other.' [State v. Shields, 45 Conn. 264.]''

In the case at bar the evidence for the State shows that the young wife and mother was visited by the defendant when he knew her husband was away; that he told her what he "wanted" and "would have;" that he forbade her to make any noise or outcry; that she knew his reputation for immorality and violence, and was obsessed with fear of him; that he dragged her from the rocking chair and from the kitchen, whither she had tried to escape, and threw his arms around her and drew her upon himself; that he knew at the time her bodily weakness; that it was only three weeks since she had passed through the throes of childbirth, when he attended her as her physician; that she struggled and pulled and pushed with all her strength; despite of which and her continuous begging him to quit, he accomplished his purpose, after which he threw her off and said "he had better run."

This was clear and strong evidence tending to show that the unfortunate young wife and mother resisted with all her strength to prevent the desecration of those sacred relations by an act of brutal lust.

It is true defendant testified to the contrary, but the record shows that the prosecutrix was corroborated by the testimony of other witnesses and by the physical facts and by all the circumstances, and that less than two hours after the event her husband found her on his return in a state of nervous breakdown, and anguish, and was immediately told the cause.

The jury had the witnesses before them. They believed the prosecutrix and did not believe the defendant. If there is one principle of law settled in the adjudged cases in this State, it is the rule that the verdict of a jury based upon substantial evidence, although contradicted by other testimony, will not be vacated on an appeal in a criminal case, unless there is a further showing of error intervening on the trial as to the admission of the evidence or in the instructions given by the court.

In a late case, this Division stated the rule thus: "We take it, in view of the unbroken line of decisions by this court, that where there is substantial evidence to support the verdict the appellate court will not undertake to retry the case upon the mere disclosures of the testimony in the record, that it is unnecessary to cite authorities upon that question." [State v. Ripey, 229 Mo. l. c. 666. See, also, State v. Espenschied, 212 Mo. l. c. 223.]

And, again, the court, having under consideration the evidence necessary to sustain a charge for an assault with intent to ravish, said: "The rule has been repeatedly announced by this court, that if there is any substantial evidence tending to show defendant guilty of the offense charged against him, the sufficiency of the evidence to support the verdict will not be considered by the appellate court." Citing cases. [State v. Urspruch, 191 Mo. l. c. 47.]

Again, in speaking on this subject, this court said: " 'The utmost resistance' doctrine does not apply where the woman is put in fear of personal violence, and her will thus overcome . . . 'A consent induced by fear of personal violence is not consent; and, though a man lay no hands on a woman, yet if by any array of physical force, he so overpowers her mind that she does not resist, he is guilty of rape by having the unlawful intercourse.' " [State v. Dusenberry, 112 Mo. l. c. 296; 2 Bishop on Crim. Law (7 Ed.), sec. 1125.]

So, in another case of assault with intent to commit rape, the court said: "It has been uniformly held by this court that when the record discloses substantial evidence to support the finding of the jury, this court will not undertake to review such finding and retry the question of facts submitted to them, from the lifeless disclosures of the record, and the verdict, with such disclosures of the record, will not be disturbed." [State v. Payne, 194 Mo. l. c. 452.]

We, therefore, hold that there was substantial evidence that the prosecutrix made all the resistance of which she was capable in her enfeebled, helpless and terrorized condition, and did not consent to the carnal act which the defendant admits and which the evidence tends to prove he performed with force against her consent. That there being thus substantial evidence of force, non-consent and penetration, all the constitutive ingredients of rape were inferably present; and the trial judge did right in sending the case to the jury.

II. Appellant's third and fourth points relate to the deductions to be drawn from the manner of the act and the absence of a great outcry. No inference of a conclusive nature can be drawn from either of these bases. At the most they give rise to a disputable presumption, which the jury were entitled to draw or not to draw as they might see fit under the circumstances in evidence.

The record in this case shows, without dispute, that the prosecutrix had little strength, not having been able to sit up a full day during the twenty-two days which elapsed since she gave birth to her child; that she only weighed ninety-seven pounds, and was nineteen years of age. It is evident that these physical infirmities would not give rise to inferences of the same strength which would arise if the prosecutrix had been a woman of full age and perfect health and

strength. At any rate, such deductions, if admissible, were not compulsory,.hence the trial court was clearly right in relegating them to the jury.

The judgment herein is affirmed.

*Roy, C.,* concurs.

PER CURIAM.—The foregoing report of the commissioners is hereby adopted as the opinion of the court.