STATE ex rel. Jo Ann WILKINS, a Minor, by Her Mother and Next Friend, Clotelle Wilkins, Plaintiff-Appellant,

v.

Ben S. MARKWAY et al., Defendants-Respondents.

No. 48600.

Supreme Court of Missouri,

Division No. 1.

Feb. 12, 1962.

Albert J. Yonke, Kansas City, for appellant.

Bond & Dominique, John O. Bond, P. Pierre Dominique, Jefferson City, for respondents Ben S. Markway and National Automobile & Casualty Co.

DALTON, Judge.

This is an action for $50,000 actual and $50,000 punitive damages based upon the charge that in April 1955, Jo Ann Wilkins, a minor under the age of 17 years and confined in the Cole County Jail in Jefferson City, was unlawfully and criminally assaulted and sexual intercourse had with her on several occasions by defendant Mankin, a deputy sheriff and jailer in charge of said jail; and that as a result of such intercourse she became pregnant and subsequently gave birth to a child on January 19, 1956, whom she has had to care for and support. The acts were charged to have been done by the sheriff and his deputy maliciously, wantonly, wrongfully and without just cause or provocation and that they constituted misconduct and abuse of official authority.

The action was brought in the name of the State of Missouri at the relation of Jo Ann Wilkins, a minor, by her mother and next friend against Ben Markway, Sheriff of Cole County, his bonding company, National Automobile and Casualty Company of California, and Earl Mankin, a former deputy sheriff and jailer for defendant Markway. The penalty of the bond sued on was for $5,000 and was conditioned that Ben Markway, the duly elected Sheriff of Cole County, Missouri, for a term beginning January 1, 1953, "shall faithfully and honestly discharge the duties of said office, then this obligation shall become void, otherwise to remain in full force and effect."

At the close of plaintiff's evidence the Court directed a verdict and entered judgment thereon for all of the defendants on the ground that plaintiff had failed to make a case for the jury. After her motion to set aside the directed verdict and for a new trial were overruled, plaintiff appealed to this Court.

Defendant Markway's official position as Sheriff of Cole County during 1954, 1955 and 1956, the execution of the official bond in question, that Earl Mankin was duly appointed a deputy sheriff by Markway and served as such, and that Jo Ann Wilkins, a minor child, more than 16 years of age, was an inmate of the Cole County Jail from October 27, 1954 to July 5, 1955, are admitted facts.

Plaintiff offered portions of a deposition of defendant Markway tending to show that he was in charge of the Cole County Jail during 1954, 1955 and 1956; that he had three deputies working under him, each one for an eight-hour shift; that Earl Mankin's shift was from 12 midnight to 8 a. m. during the spring of 1955; and that he let Mankin go in May 1955. As to why he let Mankin go, he said: "I had a report on this deal up there * * *." Markway did not say he asked Mankin to quit, but said: "We talked it over a little, I believe." As to plaintiff's pregnancy while in his jail, Markway said: "Well, looks that way;

she got pregnant while she was up there around the jail * * *." She was not out of the jail that he knew of. Each jailer had a set of keys to the cells and the tanks. The tanks had five cells and a hall. Male prisoners were not permitted to go back to do any work in the part of the jail where plaintiff was held. Only the sheriff and his deputies had keys to the cell block where plaintiff was held and no one else could get into that part of the jail.

Portions of a deposition of defendant Mankin tended to show that he was employed by the Sheriff of Cole County in 1955 as deputy sheriff and jailer; that he worked from 8 p. m. to 8 a. m.; that the colored women in the jail were separated from the colored men and from the white men; that doors separating the several parts of the jail were kept locked; that while plaintiff was a prisoner in the jail he had never seen her outside the jail building; and that so far as he knew she had not left the jail during her stay there.

Plaintiff's testimony tended to show that she was born July 28, 1938; and that, when she was 12 years old, she had difficulty about going to school and was sent to the Little Blue Home, a school for juvenile boys and girls, in Kansas City. She ran away from that home the next year and was sent to the Tipton Training School for Negro girls in November 1951. In July 1953, she ran away from the Tipton Training School and returned to Kansas City, but was caught and returned to the Tipton Training School in November 1953. In June 1954 she was transferred to the women's penitentiary in Jefferson City, apparently under the provisions of Sec. 219.230 RSMo 1949, V.A.M.S.

During the riot in the State penitentiary in October 1954, plaintiff started a fire in the women's penitentiary and was later charged with arson and sent to the Cole County Jail on October 27, 1954. She was then 16 years old. She remained in the Cole County Jail until July 5, 1955, when she entered a plea of guilty to a charge of arson and was sentenced to two years' imprisonment and sent to the women's farm. She was released from the women's penitentiary on November 3, 1956.

Concerning her imprisonment in the Cole County Jail, plaintiff testified that she and two other colored girls, Shirley Skinner and Shirley Kempker, were placed in a cell block containing six cells. There was a steel door at the end of the cell block which was locked at all times, except when meals were sent in. The deputy on duty had the key to this door. The only person who came into this cell block was the trusty who brought the food and who was always accompanied by a deputy. No man ever came into the cell block alone while she was there. There was a sort of hall in front of the cells and, after four or five months, the girls had the freedom of the cell block and this hall.

In April 1955, Earl Mankin was the deputy on duty from midnight until 8 a. m. On one occasion in April 1955, sometime after midnight, Mankin, and a trusty named Jim, brought a white girl to the cell block and locked her up and took plaintiff and Shirley Kempker downstairs to the office on the first floor, where Mankin sent Jim out to get coffee for the men and cokes for the girls. Mankin then sent Shirley Kempker down the hall to another room, but she was not locked up. Mankin was more friendly than usual and he appeared to have been drinking. He smelled of alcohol and his face appeared flushed. After the trusty left, Mankin started to pat the plaintiff's bottom and to feel of her. At that time plaintiff was 16 years of age and weighed about 120 pounds. Mankin asked plaintiff when she had last had intercourse with a man and, after she told him, he asked if she wouldn't like to have intercourse again and she said "No." Mankin then proceeded to unfasten the zipper on her pants, but the trusty came back and gave the coffee to Mankin, a

coke to plaintiff and took a coke to the room where Shirley had been sent. After some five minutes Mankin locked Shirley up (it does not appear where) and he then locked plaintiff in the "hole" or "hold," a room on the first floor with four bunks in it. Mankin then went away, but later he came back to the "hole" and unlocked the door, opened it and came in where she was seated on the bed and again began talking to plaintiff about having intercourse with him. He asked if she wouldn't "enjoy it because it had been so long." He felt of her and asked her for a kiss. When she protested, he did not try to force her. He then unfastened her pants and took them off and pushed her back on the bed and had sexual intercourse with her. When he had finished he told her not to tell anyone about what had happened, that she had better not tell anyone or she would not get out of the "hole." He did not remove his clothes on this occasion, only unbuttoned his pants. He again locked her in the "hole" and left her, but the next morning plaintiff was released from the "hole" and taken back upstairs by another deputy. Shirley was already up there. Plaintiff asked to see Prosecuting Attorney Riley on the day following the occurrence and told him about what had happened.

On cross-examination concerning this first occasion, she testified that Mankin patted her on her bottom and hips and put his hand inside her waist and unfastened her jeans by the zipper on the side. She did not have any panties under the blue jeans. On this first occasion when Mankin unfastened her pants, unbuttoned and unzipped them, he did not get them down, because plaintiff was holding them up and resisting. She protested, but did not yell or scream, because there was no need in yelling. She said that to protest was the only thing she could do at the time. She protested, and said "No," and was trying to hold up her pants with her hands, as that was all she could do. It was night time and there were no lights in the room, but there was "a little bitty light in the top of the wall." Mankin came into the room where he had locked her up and started talking again as he had in the office. After he came in the room, she closed the door to the "hole," but she did not know whether Mankin locked it. It was a solid door with no windows and there were no windows in the "hole." He again asked her if she didn't want a man and if she didn't think it would be fun and she answered "No" to both questions. Mankin sat on the bed beside her and pushed her back on the bed. He didn't get her blue jeans completely off. She was small and was no match for him. He was on top of her when he finally got one leg out of her pants. She said she did not want to do "it," she protested, but did not yell because it wouldn't have done any good. There was no one to call on for help, except the deputy who was making the attack. The other inmates of the jail could not have heard her and it wouldn't have mattered with the trusty, since he was trying to do the same thing to the other girl in another room. So Mankin went right ahead, but she did not cooperate with him. She just lay there and let him do "it," because she couldn't move. As to not making much physical effort to protect herself, she said: "* * I was quite small at that time, and I was no match for him, for a man his size. And I had learned by then that it wouldn't do no good to scream anyway. * * * so I didn't. * * * when he sat on the bed he pushed me back on the bed, and him being bigger than me, there was no way I could get out from under him."

Two or three nights after the first occurrence Mankin again came to the third floor cell block and told plaintiff the neighbors were complaining about the noise and he took her down to the "hole" on the first floor and locked her in the "hole" and left. The other girl was left in the cell block upstairs. Mankin came back to plaintiff in about 30 minutes. Plaintiff wore panties, a brassiere and a dress. She was

sitting on the bed when Mankin came in where she was. He had some vaseline in his hand. He wanted her to use it and she refused. He pushed her back on the bed and put the vaseline on her private parts and had sexual intercourse with her. At the time Mankin had intercourse with her, he did not have any clothes on and he had taken off her panties. When he left, Mankin again told her she had better not tell anyone and if she did he wouldn't let her out of there. He also told her he was going on a vacation and it would do no good, because she wouldn't see him any more. However, she did tell defendant Markway of the incident, but he said she was telling a lie.

On cross-examination as to this second occurrence, she said that Mankin returned with vaseline within 5 or 10 minutes after he took her downstairs and locked her up in the "hole." He came in and sat beside her and then removed all of his clothing. That conduct gave her some idea of what he had on his mind and she knew what he was going to try to do. He then took off her panties and ripped them on the side in removing them. He took them off against her wishes, and while he was naked and in bed with her. She tried to hold her legs together, she tried to get out of the bed and she tried to keep her panties on. She also resisted his efforts to use his hands in applying the vaseline. She did not scream or holler at any time, because it would have done her no good. She also said she had learned by then that there was no use to scream, so she did what she could. She could not jump out of the bed because Mankin was on top of her and she was too small for him.

She said that the first person she told after this second intercourse was defendant Markway, after Mankin had left and after she had discovered that she was pregnant, but that she did tell Mr. Riley before she discovered she was pregnant. Later, she said she was confused; that Markway was the first one she told about "it"; that

she had told Markway about the last occurrence the next day after it happened; that she told Markway the first day after Mankin quit working, which was the next day after the last assault. She did not then tell him of the first assault. Later she said she first mentioned Mankin when she told Riley of the occurrence.

Plaintiff further testified that she did not try to bite Mankin or scratch him on either occasion; that she gave him trouble, but his weight was too heavy for her; and that she tried, but couldn't move very well. She said: "We struggled on the bed and he overcame me. After all, he is a man, I was a kid."

Plaintiff's child, a 7 pound, 7 ounce boy, was born at St. Mary's Hospital in Jefferson City on January 19, 1956, after a full-term pregnancy of 40 weeks. A few days after the birth of the child she was again returned to the women's farm where she remained until she was released from the women's penitentiary on November 3, 1956. Plaintiff said she had never had sexual relations with any man except Mankin while she was in the penitentiary or in the Cole County Jail. The pregnancy in question was plaintiff's second pregnancy. She had had a miscarriage after a pregnancy that had preceded the alleged assaults in question. She also testified that she had had a miscarriage since. She has never been married.

As to Mankin's conduct toward plaintiff and the other colored girls the plaintiff testified that Mankin "usually curses us out"; that he had never attempted to strike her, but he was "always insulting to all of us"; that he seemed to have a particular feeling against Negro prisoners; and that she had heard him use the word "Nigger" more than once. Plaintiff said that Mankin had not called her down for cursing and yelling and hollering, because he did too much of that himself, but that she may have used obscene language, but she didn't use it frequently.

As stated, each of the three defendants filed a motion for a directed verdict at the close of plaintiff's evidence on the theory that plaintiff had failed to make a submissible case. The trial court sustained each of these motions, directed a verdict for defendants and entered judgment thereon. This action of the trial court is not referred to or assigned as error under appellant's Points and Authorities. See Supreme Court Rule 83.05(a)(3) and (e), V.A.M.R.

Appellant's first point is that "plaintiff made a submissible case on the theory that she was raped by the deputy jailer." Appellant cites State v. Catron, 317 Mo. 894, 296 S.W. 141, 143 and State v. Moore, Mo.Sup., 143 S.W.2d 288, 289. These cases are cited on the issue of whether plaintiff offered the utmost resistance to Mankin. The factual situations in the Catron and Moore cases were totally different from the facts here. The woman in the Catron case was accosted at night on a highway and taken from her companion at pistol point and carried away by strangers and threatened with great bodily harm and, while so frightened and intimidated, she offered no physical resistance. In the Moore case the woman was choked and threatened with death and offered no physical resistance. Apparently, the Catron and Moore cases were cited only for certain statements of law contained therein.

In the Catron case the Court said: "If the record had shown merely an act of intercourse by force, the utmost resistance would probably have not been established. The record, however, develops further facts and circumstances, such as fear of personal violence, and we have held that the utmost resistance doctrine is not applicable to a state of facts where the female is put in fear of personal injury. State v. Barbour, supra. The amount of resistance necessary to annul consent depends on the uselessness of resistance. Neither actual physical force nor physical resistance is necessary, if the woman yields through fear caused by threats of great bodily harm or injury, for such is constructive force, deleting the necessity of the utmost physical reluctance and resistance, and constituting the intercourse rape, provided the threats are made previous to the act." State v. Catron, supra, 296 S.W. 141, 143(4); State v. Barbour, 234 Mo. 526, 137 S.W. 874.

In the Moore case the Court said: "'A consent induced by fear of personal violence is no consent; and, though a man lay no hands on a woman, yet if by an array of physical force he so overpowers her mind that she dares not resist, he is guilty of rape by having the unlawful intercourse.' Bishop, Criminal Law, 7th Ed., Sec. 1125." State v. Moore, supra, 143 S.W.2d 288, 289.

Appellant argues that she was forced to have intercourse with Mankin against her wishes; that in determining the matter of consent and resistance the surrounding circumstances must be considered, to wit: that she was a 16-year old child entrusted to the deputy jailer for care and protection and safekeeping; that there was no use to scream or call, since none could come to her aid, as Mankin alone was in charge; that she had been an inmate of a penal institution and her experience had taught her the danger of punishment for disobedience; that it was manifestly useless to resist Mankin's advances; that she was small and young and he a man of superior physical power; that the act occurred in the "hole" where none could come to her aid; and that the tearing of her panties on the second occasion and her subsequent reports to Markway and Riley, all go to show that she did not consent, but offered the utmost resistance under the circumstances shown.

Appellant has properly directed attention to the essential and determinative issue in the case on the charge of rape, to wit: whether appellant's evidence shows that the act of intercourse was performed without her consent and against her will.

In the case of State v. Catron, supra, 296 S.W. 141, 143, it appears that, "The

phrases 'against the will' and 'without the consent' of the female, interpreted as equivalent terms, are defined as the manifestation of the *utmost reluctance* and the *greatest resistance* on the woman's part." (Italics ours.)

Let us review some of the facts appearing in this record. It is true that plaintiff was a child under 17 years of age, but she was no stranger to the act of sexual intercourse. She freely testified that she had previously been pregnant and had had a miscarriage. While, of course, a lewd woman may be raped, there were no objections here to plaintiff's own testimony on direct examination as to these matters which bear upon the issue of consent and want of resistance. When solicited for intercourse, she did not hesitate to tell Mankin how long it had been since she had indulged; and when solicited in the office she did not seek to resist his attentions or to escape therefrom; or report the matter to the trusty (Jim) or to Shirley. Later, when Mankin unlocked and entered the room or "hole," where she had been placed, she did not seek to escape, but admitted that, after Mankin entered she closed the door. She didn't remember whether Mankin then locked it or not. When favors were again solicited, she didn't get off the bed or seek to leave. No threats of bodily harm or physical violence were even suggested. There was no violence to her person, either actual or threatened. She was not seized, held or even an arm twisted. The only force exerted was the weight of his body in pushing her back on the bed and removing part of her clothes.

Before the second occurrence, she sat on the bed beside Mankin while he removed all of his clothes, although she well knew what he had in mind. She made no effort by acts or violent language to deter him from his plan. Her own testimony concerning Mankin's earnest and repeated solicitations and arguments fail to evidence an intent on Mankin's part to use force, threats or violence to accomplish his purpose.

Plaintiff's testimony concerning a free discussion of the matter of sexual relationships with others and his requests show that consent was denied only by the use of the word "No."

When asked whether Mankin tore her panties in taking them off, her only reply was that, "They were ripped on the side because he took them off." There is no evidence that Mankin struck plaintiff, cursed her or vocally abused her. She testified to no fright or anticipation of physical violence either before or after the occurrence. She did not scream or shout for help. So far as the record shows plaintiff did not curse or abuse Mankin, or bite him, scratch him or hit him, or take any aggressive action against him, except perhaps to try to hold up her clothes or to prevent the application of the vaseline. It is true that no affirmative consent was given in words. So far as appears from the record, neither party suffered any bruises or scratches or physical injuries of any kind. The evidence also fails to show any emotional outbursts by plaintiff of either temper or tears. When Mankin wanted to kiss her and she said "No," he did not seek to force a kiss upon her. While she said that *after* each intercourse Mankin told her not to tell it or she would not get out of the "hole," there is no suggestion in the record that she believed his statement, or was in anywise deterred or frightened by him. As stated, no prior threats of any kind were shown. While there is evidence in the record that plaintiff told Riley about what had happened and also reported to Markway after Mankin was no longer employed, yet there is much conflict in her testimony. At the time her pregnancy was being investigated, she said they (Markway and the head of the women's prison) "wanted to know who the father was" and that she did not tell Markway who was to blame for her pregnancy. She said: "I didn't tell him then because I had told my mother, I didn't tell him who it was. I had talked to my mother and she told me not to tell anyone anything until she talked to me further."

While appellant emphasizes that she was a prisoner in the jail and it was Mankin's duty to protect her, we do not find these facts conclusive on the issue of rape under plaintiff's own evidence. Appellant's brief fully recognizes that (to make out a submissible case of rape) the evidence must show that plaintiff offered the utmost reluctance and the greatest resistance possible under the facts.

The applicable rule is well stated in Champagne v. Hamey, 189 Mo. 709, 726, 88 S.W. 92, 97, as follows: "To entitle plaintiff to recover in this action it must be shown by some substantial evidence that the defendant, by force and violence and against her will, ravished her. * * * The statements of plaintiff as to this occurrence must be viewed in the light of all the surrounding facts and circumstances. If the physical facts and all the circumstances appearing in evidence, together with the surrounding conditions, absolutely negative and destroy the force of such statements, then, in contemplation of law, such statements do not amount to any substantial evidence of the facts to which they relate. We do not mean by this that the prosecutrix must be corroborated, for such is not the law of this state. (State v. Marcks, 140 Mo. 656, 41 S.W. 973, 43 S.W. 1095.); but we do hold that statements made by a witness that are, not only in conflict with the experience of common life and of the ordinary instincts and promptings of human nature, but negatived as well by the conduct of the witness, and the conditions and circumstances surrounding the occurrence to which they have application, are not sufficient to support the grave and serious charge of *rape,* and this is true whether the charge is made in either a civil or criminal proceeding." And see Williams v. Collins, 180 Mo.App. 146, 155, 167 S.W. 1189.

■ After a careful consideration of the entire record we find the evidence insufficient to make out a case of rape. Plaintiff's own testimony, considered as a whole, is not substantial or sufficient to show a want of consent, in that it fails to show the utmost resistance possible under the existing facts and circumstances. Champagne v. Hamey, supra (189 Mo. 709, 715, 727, 88 S.W. 92); State v. Hamey, Mo., 65 S.W. 946, 951 (same facts reviewed); Robinson v. Musser, 78 Mo. 153. And see State v. Remley, Mo., 237 S.W. 489 (citing Champagne v. Hamey, supra); State v. Burton, 355 Mo. 467, 196 S.W.2d 621, 623; State v. Burgdorf, 53 Mo. 65, 67.

Appellant further contends that "plaintiff made a submissible case on the theory that she had become pregnant while in defendants' custody," even if her pregnancy was due to voluntary sexual relations with Mankin or someone else.

■ The only authority cited in appellant's brief under this heading is a reference to Section 221.310 RSMo 1949, V.A.M.S. making it "the special duty of the court having criminal jurisdiction, at each term, to inquire and see that all prisoners are humanely treated." In view of the record in this case the mentioned statute has no application. While it is no doubt true that a 17-year old female prisoner should not be permitted to have sexual intercourse with anyone during the period of her imprisonment, the fact that such relationship may occur with the voluntary consent of the prisoner may not be made the basis for a recovery of actual or punitive damages from the guilty party or from the sheriff and his bondsmen. Reprehensible as such conduct would be if participated in by an officer in charge, we find no authority authorizing such a recovery of damages under the facts shown by this record. No such authorities have been called to our attention. We must and do hold that the facts shown by this record are insufficient to support a recovery of either actual or punitive damages. The Court did not err in dismissing the plaintiff's petition.

The judgment is affirmed.

All concur.